UNITED STATES of America

v.

Nicholas J. MANGIERI, Jr., Appellant.

No. 82–1294.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1982.
Decided Nov. 23, 1982.

Lynne Bernabei, Washington, D.C. (appointed by the court), for appellant.

Katherine Winfree, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., at the time the brief was filed, Judith Hetherton and Charles H. Roistacher, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before WRIGHT, WALD and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Nicholas J. Mangieri appeals his conviction by a jury on nine counts of making false statements on applications for loans from a federal credit union, in violation of 18 U.S.C. § 1014. Appellant attacks his conviction on six grounds:

(1) selective prosecution;

(2) illegal amendment of the indictment during trial;

(3) an improper jury instruction on unanimity;

(4) failure to suppress illegally obtained evidence;

(5) failure to grant a new trial on the ground of newly discovered evidence; and

(6) materials withheld in violation of the *Brady* rule.

After painstaking review, we reject all six arguments and affirm the judgment of the district court.

## I. BACKGROUND

This prosecution took place against a bureaucratic backdrop of fierce infighting, threatening accusations, and "whistleblowing" claims within the Department of Labor's (DOL) Office of the Inspector General. Because of the potential for abuse inherent in the prosecution of a disgruntled employee for a relatively minor crime, we reviewed the record of this case with particular care. As a result of that review, we find no reversible error—despite any concerns we may have about the government's extensive allocation of resources to this case, and the summary manner in which the district court handled some of appellant's objections.

Appellant began working at DOL as a criminal investigator on July 2, 1978. Trial transcript (Tr.) at 220, 313.[1] Facing numerous expenses after a period of unemployment and relocation, *id.* at 335, appellant promptly applied to the Department of Labor Federal Credit Union (DOLFCU) for nine small loans between July 5, 1978, and October 1, 1979. On all nine loan applications, appellant failed to disclose thirteen outstanding debts (totaling over $30,000), as well as the fact that he had twice "taken bankruptcy."[2] He listed other debts amounting to about $5,500. *Id.* at 221. DOLFCU granted appellant four loans, totaling approximately $7,300. *Id.* at 219–36. Appellant has made the payments due on these loans through payroll deductions. *See* 2–11–82 Tr. at 7.

On January 15, 1981, a grand jury indicted appellant on nine counts of making a false statement to a federal credit union for the purpose of obtaining a loan—one count

for each loan application. R. at 1:1–3; *see* 18 U.S.C. § 1014. At the jury trial, which began on April 27, 1981, appellant acknowledged the existence of the thirteen debts listed in the indictment, and that he had twice been declared bankrupt. Appellant's Opening Brief at 6. His defense was that he had not intended to defraud the DOLFCU. He testified that he did not list certain debts from Alaska because he had a "mental block" about that period of his life. Tr. at 335–36. He ignored other debts because he believed that property had been sold or repossessed to satisfy them, that debts "written off" by the lender were no longer legal obligations, and in one case that a judgment against him for money was not final. *Id.* at 343–53, 371–76, 387–93, 406, 437, 441–43. He also testified that he did not believe it necessary to report the bankruptcies because a lawyer had told him that they were legally expunged from the record after seven years. *Id.* at 336, 415–16. Appellant offered experts in psychiatry and bankruptcy law to support portions of his testimony.

On May 1, 1981, after a five-day trial, the jury convicted appellant on all nine counts. Appellant filed his first motion for a new trial on May 15, 1981; the court denied this motion on May 28.[3] On November 3–4, 1981, the court conducted an evidentiary hearing on appellant's motion to dismiss for selective prosecution. Appellant made this motion prior to trial, but the court delayed the hearing so that it would have the benefit of the Internal Revenue Service's (IRS) independent investigation of appellant's charges.[4] On February 3, 1982, the district

---

1. "Tr." refers to the trial transcript (April 27–May 1, 1981). "H.Tr." refers to the hearing transcript on appellant's motion to dismiss for selective prosecution (November 3–4, 1981). Other transcripts are identified by the date of the proceeding, *e.g.*, "2–26–81 Tr."

2. *See* Record (R.) at 1:1–3. Since the Record is only numbered by item, citations to it will give the item number, followed by a colon and the page(s).

3. Appellant does not specifically appeal the trial court's denial of this first motion for a new trial. We review several of the grounds stated

in this motion, however, in our discussion of the motion to suppress evidence and the request for a jury poll to ensure a unanimous verdict.

4. On February 20, 1981, the Merit Systems Protection Board asked the Secretary of Labor to conduct an investigation of appellant's allegations that officials in the Department's Office of the Inspector General had obstructed his investigation of the District of Columbia CETA program. One of appellant's allegations was that he was a victim of retributive prosecution. On March 7, the Secretary asked the Internal Revenue Service (IRS), as an independent

court denied the selective prosecution motion. R. at 32:4. On February 11, the court suspended the imposition of sentence and placed appellant on probation for two years. *Id.* at 34:1. Appellant filed a second motion for new trial on February 19, 1982, this time on the ground of newly discovered evidence. The court denied this motion without hearing on March 8. *Id.* at 41:1. Appellant then appealed his conviction to this court. Each of his six contentions are discussed below.

## II. SELECTIVE PROSECUTION

■ Appellant asserts first that the trial court erred in denying his motion to dismiss the indictment on the ground of selective prosecution. To prevail on a defense of selective prosecution, appellant has to prove both that he was singled out for prosecution among others similarly situated *and* that the decision to prosecute was improperly motivated. *Attorney General v. Irish People,* 684 F.2d 928, 932 (D.C.Cir. 1982) (per curiam); *United States v. Wilson,* 639 F.2d 500, 503 (9th Cir.1981); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974). This is a rigorous test; "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). To show improper motivation, appellant has to establish "that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," *id.; United States v. Diggs,* 198 U.S.App.D.C. 255, 613 F.2d 988, 1003 (1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980), or was designed to prevent or paralyze his exercise of constitutional rights, *Irish People,* 684 F.2d at 932 n. 11 (quoting *Berrios,* 501 F.2d at 1211); *Wilson,* 639 F.2d at 503–04.

■ Appellant asserts that he was prosecuted in retaliation for "whistleblower" activities protected by the first amendment.

Those activities, however, were only strands in a tangled web of acrimonious accusations between appellant and his supervisors in the Inspector General's Office. A brief exposition of this intrigue is necessary to understand the theory of appellant's defense.

In July 1978, appellant started work as an investigator with DOL's Office of Special Investigations, which became the Inspector General's Office later that year. He experienced no difficulties until Marjorie Knowles became Inspector General of DOL in early 1979. H. Tr. at 86–90. Appellant asserts that his troubles with Knowles and others began soon thereafter as a result of his investigation of sexual harassment in the Comprehensive Employment Training Program (CETA), and in particular, his probe of District of Columbia CETA programs. He alleges that when his investigation turned toward prominent local officials his supervisors told him to slow down, impeded his work by shifting him from a field office to the headquarters office, charged him with minor violations of departmental rules, and prevented him from testifying before a Senate subcommittee. *Id.* at 90–100. After the chief auditor of the Inspector General's Office told appellant that Knowles had terminated an audit of CETA and Youth Pride, *see id.* at 100–01, 209, a program with which Mayor Marion Barry, Jr. had been affiliated previously, appellant filed obstruction of justice charges against Knowles and others with the Attorney General. *Id.* at 102. According to appellant, when the press printed the story of the "coverup," his supervisors harassed him further, removed him from the case, and reassigned him to "menial workmen's compensation duties." *Id.* at 102–08. He also asserts that he received an implicit threat that he would be fired if he did not stop talking to the press. *Id.* at 121–22.

The CETA investigation was not the only source of friction between appellant and his supervisors. Late in February 1980, appellant said he received a tip that Ronald

agency, to conduct the investigation. The IRS issued its report on August 5, 1981. The trial court admitted into evidence at the selective prosecution hearing the IRS's volumes of ex-

hibits and affidavits, but not the volume of conclusions. Some of these exhibits and affidavits are included in Appellant's Appendix (App.).

Goldstock, the Deputy Inspector General, had used travel vouchers improperly. Without informing his supervisors, appellant obtained Goldstock's travel vouchers, examined them, and referred the information to the FBI (which did not subsequently bring charges). He was later interrogated by a supervisor about these acts, his office safe was "ransacked," and a supervisor and another agent came to appellant's home to relieve him of his "credentials," pursuant to a written request by Goldstock. *Id.* at 108–14. Appellant was then relieved of his investigative responsibilities and reassigned to duty as a legislative analyst. *Id.* at 116.

As a culmination to this conflict, appellant claims that his supervisors instigated an intensive investigation into his background in order to "get him." That investigation, he asserts, produced the evidence about deficiencies on his credit union loan applications that formed the basis of his indictment. To support his claim, appellant points out that the officers of the DOLFCU had not requested his referral for criminal prosecution. App. at 62–63, 163–65. Indeed, one officer did not know of any other criminal referral from the credit union for a fraudulent loan application during his fourteen years of service, *id.* at 163–64, and former United States Attorney Charles F.C. Ruff, recalled only two prosecutions under 18 U.S.C. § 1014 during his term, *id.* at 193.

The government dismisses appellant's claims as figments of an overactive imagination and a disputatious personality. *See* Appellee's Brief at 16 n. 8; H. Tr. at 154–58. A.M. Statham, Assistant Inspector General for Investigations, testified that he reassigned the CETA case because of appellant's demonstrated incompetence; Statham's review of appellant's investigative file on the case revealed that appellant had made little progress, and was lacking any sense of direction in the probe. *See* H. Tr. at 227–29. Statham also explained the genesis of the background investigation that ultimately produced the evidence of false statements on loan applications. When Statham assumed his post at DOL in 1979, he was surprised to learn that no background checks had ever been performed on the investigators. Accordingly, he recommended that such investigations be undertaken because of the nature of the office's work and its associations with other agencies. *Id.* at 217–18. On December 27, 1979, Inspector General Knowles requested the Office of Personnel Management (OPM) to undertake background checks of all employees in the Inspector General's Office, including sixty to seventy employees in appellant's Office of Investigations. Appellant crossed out a line on a release authorizing OPM to obtain financial information, but the basic investigation of his background went forward along with the other investigations anyway. *Id.* at 222–26. OPM returned its report on appellant in April 1980. *Id.* at 230–31.

Statham found potentially troublesome discoveries in OPM's reports on appellant and a few other employees. In appellant's case, Statham perceived evidence of past financial difficulties and discrepancies between OPM's report and the information supplied on appellant's application for employment. Statham also thought that appellant's previous experience did not qualify him to serve as an investigator. Statham recommended that the Internal Affairs Division of DOL reinvestigate appellant and approximately seven other employees to determine their suitability for security clearances and investigative work. *See id.* at 234–38.

On June 2, 1980, Statham assigned the additional check on appellant and a number of other agents to Harold Anderson. Anderson, who had recently been detailed to the Inspector General's Office, did not know appellant personally. After reviewing the OPM report and other background information on appellant, Anderson started his investigation by looking into: appellant's involuntary terminations of employment; periods of unemployment for which appellant had not accounted; an allegation that appellant had carried a firearm without authorization during an investigation; and appellant's financial difficulties (including bankruptcies, numerous debts, and use of a bad check). *See id.* at 239, 294–305.

Anderson's investigation of appellant was extensive, to say the least. After traveling to a number of states and interviewing hundreds of witnesses, Anderson discovered enough evidence to conclude that there was a substantial likelihood that appellant had committed a crime by failing to disclose bad debts and bankruptcies on his recent loan applications. In July 1980, while in Alaska to check out information· on appellant, Anderson outlined the results of his investigation to the local U.S. Attorney's Office; it opened a grand jury investigation, but no indictment ensued. *See id.* at 307–15, 422–26.

Upon returning to Washington, D.C. in August 1980, Anderson relayed his findings to attorneys in the Criminal Division of the Department of Justice. He was ultimately referred to Richard Beizer, Chief of the Fraud Division in the U.S. Attorney's Office for the District of Columbia. Goldstock and Anderson met with Beizer on August 20. After explaining the friction between appellant and himself (*i.e.,* the travel vouchers and the obstruction of justice allegation) Goldstock indicated to Beizer that he believed appellant ought to be prosecuted on the loan application charges. *Id.* at 318, 427–28, 449.

Beizer told Goldstock and Anderson that he "didn't want to be trying some lawsuit between [appellant] and Goldstock," and that his decision whether to prosecute would be based on the evidence as to whether appellant had filed a false statement with the DOLFCU and "whether or not that case warranted prosecution." *Id.* at 444. Beizer testified that his subsequent decision to take appellant's case to the grand jury was based on the following factors: as a criminal investigator appellant

should have understood what the loan applications requested; appellant had a history of running away from bad debts; the case had jury appeal; and, as a result of a recent reorganization assigning his office responsibility for similar economic-crime cases, he had recently prosecuted a similar case involving a modest loan. *See id.* at 443–48.

Given this evidence, we would have great difficulty in overturning the district court's denial of appellant's selective prosecution motion. The district court found that appellant "made no showing whatsoever of improper motivation on the part of the U.S. Attorney," and that appellant had not persuaded it that DOL's referral to the U.S. Attorney was an attempt to curtail "whistleblowing activities." R. at 32:3. In support of its findings that DOL had not acted improperly, the court noted that the IRS's independent investigation found no evidence of retaliation or reprisal by DOL against appellant for "whistleblowing." *Id.* Appellant's challenge to the district court's denial of his motion focuses on two issues: first, that the district court erred by only examining the motives of the U.S. Attorney's Office; and second, that the only support the trial court had for its finding about DOL's motivation to investigate him is the IRS report it had refused to admit into evidence.[5]

Since appellant does not impugn the integrity of the prosecutors in this case, any case of selective prosecution, if it is to be made at all, must be made on the basis of improper motives on the part of DOL personnel that unalterably poisoned all subsequent prosecutorial decisions.[6] Indeed, proof of improper motivation would have to stretch back even beyond the referral decision itself since under the Inspector General

---

**5.** Since our review of the hearing record reveals support for the district court's conclusion that DOL neither singled appellant out for investigation, nor acted on improper motives, we need not deal with the trial court's reference to the conclusion of the IRS report, which he had not admitted into evidence. *See* H.Tr. at 459–61. It appears to us, however, that the trial judge simply referred to the finding of the independent IRS investigation as a means of underscoring the conclusion he reached after listen-

ing to two days of testimony and reading the various documents and exhibits.

**6.** It is possible that "personal vindictiveness on the part of a prosecutor *or the responsible member of the administrative agency recommending prosecution* would ... sustain a charge of discrimination." *United States v. Bourque,* 541 F.2d 290, 293 (1st Cir.1976) (citation omitted) (emphasis added).

Act of 1978, 5 U.S.C. app. § 4(d), Inspectors General must report incidents to the Attorney General whenever they have "reasonable grounds to believe there has been a violation of Federal criminal law." We must therefore question whether impermissible motives at the investigatory stage—even if proven—could support a finding of selective prosecution in a case such as this, where the referral is required by law and the legitimacy of the prosecutor's response is not implicated. However, we need not decide that question because the evidence in this case does not prove that appellant was singled out—even at the investigatory stage—because of his whistleblowing.

Appellant's attack on DOL's motives is, we believe, adequately and dispositively rebutted by the lengthy account of the trial evidence recounted above. True, the record is replete with examples of friction between appellant and his supervisors. But the preliminary investigation into appellant's background bears no indicia of selectivity—the Inspector General for good reason requested checks by OPM of all employees in her office, including the entire investigative staff to which appellant belonged. The ensuing OPM report raised some legitimate questions about the backgrounds of appellant and a few other agents; these concerns reasonably warranted a more thorough review. In appellant's case, the problems surfaced by the investigation included evidence of financial difficulties, discrepancies between what the investigators found and what appellant wrote on his application for employment, and a lack of required investigative experience for the job. The follow-up investigation of appellant and other employees was assigned to Anderson, a stranger to appellant. Anderson's thorough investigation in turn produced the evidence of false statements by appellant on DOLFCU applications, which prompted Anderson and Goldstock to refer the matter, as required by law, to the U.S. Attorney. Goldstock explained his conflicts with appellant to Assistant U.S. Attorney Beizer, who made it clear that his decision to prosecute would not be based on the disagreements between appellant and Goldstock.

Appellant, of course, sees the situation differently and points to some evidence supporting his claim that his supervisors were out to "get him." The district court, however, after listening to two days of evidence and reviewing the affidavits and exhibits to the IRS report, decided not to credit appellant's charges. Given the extensive hearing, and the evidence produced therein, we cannot find that the court erred. Appellant did not meet the high threshold standards necessary to establish a case of selective prosecution either as to improper motivation or even as to selection among similarly situated defendants.

### III. DEPARTURE FROM THE INDICTMENT

Appellant next asserts that the district court must be reversed because it permitted the prosecutor to amend the indictment to list another allegedly unreported debt during the trial. The government replies that the facts to which appellant refers only produced a minor variance between a term of the indictment and the evidence the government presented as proof. The government further contends that the variance was not prejudicial because it was not material and did not affect any substantial rights of the defendant.

To understand this controversy, it is necessary to review the indictment. It charged appellant with nine separate violations of 18 U.S.C. § 1014 for failing to report thirteen debts and the fact that he had twice filed for bankruptcy, on nine different applications for loans from the DOLFCU. One of the allegedly unlisted debts was to the Alaska School Employees Federal Credit Union (Alaskan Credit Union). The indictment listed the amount of this debt as $2,512.88. See R. at 1:1–3.

During the trial, the government introduced evidence on two debts appellant owed the Alaskan Credit Union. One debt involved a secured loan appellant received in September 1975 to purchase a truck (the "truck loan"). Appellant signed a confession of judgment in the amount of $1,436.20 still owed on this truck loan after the truck

was repossessed and sold. Appellant received the second loan from the Alaskan Credit Union in December 1975 (the "signature loan"). After he defaulted on this signature loan, the Alaskan Credit Union obtained a confession of judgment against him for $2,512.88—the amount specified in the indictment. *See* Tr. at 189–200.

The government admitted at trial that appellant had effectively disclosed the signature loan, even though the indictment listed the *amount* of the signature loan. The government's justification for the evidence on the truck loan was that the grand jury had heard evidence on both debts and simply made a mistake on the amount when it listed a single debt to the Alaskan Credit Union. Therefore, the government argued, the specification in the indictment was for the truck loan, which appellant had not disclosed, but the amount listed was mistakenly that of the signature loan. *See id.* at 202–04.

After appellant's trial counsel objected to the government's introduction of evidence on the truck loan, the trial court informed the jury that appellant "did report the existence of the signature loan in the amount of $2,511.88 to the credit union." *Id.* at 204. The trial court subsequently denied appellant's motion to strike the Alaskan Credit Union debt from the indictment. *Id.* at 544–45. And the court instructed the jury that it need not find that the government proved the exact debt amounts stated in the indictment in order to satisfy the elements of the offense. *Id.* at 613. These explanations should have made it clear to the jury that the indictment's specification of an Alaskan Credit Union debt referred to the truck loan.

We noted in *Gaither v. United States,* 134 U.S.App.D.C. 154, 413 F.2d 1061, 1071 (1969), that "[t]he courts have recognized two kinds of erroneous departure from the original indictment of a grand jury, each with its own standards governing prejudice": an amendment and a variance. *Gaither* described the difference between the two:

An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.

*Id.* (footnotes omitted) (emphasis in original).

This case clearly does not involve a literal alteration of the indictment; the court submitted the indictment to the jury in its original form. Nor do we find that there was a constructive amendment. A constructive amendment occurs when, even though the indictment is not literally changed, "the evidence presented at trial *and* the instructions given to the jury 'so modif[y] the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment.' " *United States v. Gonzalez,* 661 F.2d 488, 492 (5th Cir.1981) (emphasis in original) (quoting *United States v. Ylda,* 653 F.2d 912, 914 (5th Cir. 1981)); *see Stirone v. United States,* 361 U.S. 212, 217–19, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960) (effective amendment when the grand jury charged that conduct interfered with interstate importation of sand, but the government also offered evidence on interference with interstate exportation of steel).

To distinguish between a constructive amendment and a variance, courts have examined "the elements of the offense, the allegations of the indictment, and the nature of the evidence." *United States v. Crocker,* 568 F.2d 1049, 1060 (3d Cir.1977) (citations omitted). In this case, the evidence on two different Alaskan Credit Union debts surely did not modify the elements of the single offense charged, nor did it confront appellant with "a prosecution for an additional or different crime." *United States v. Fruehauf,* 577 F.2d 1038, 1057 (6th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The govern-

ment's proof, in fact, failed to establish two unreported debts to the Alaskan Credit Union, much less two crimes, and the trial court so informed the jury when it told them that appellant had reported the signature loan. The total effect of the variance was confined to the *amount* of the unreported debt—and the exact amount of an unreported debt is specifically not made an essential element of the offense charged. *See* 18 U.S.C. § 1014; Tr. at 613–14.

Turning to the issue of whether the variance was impermissible, the Supreme Court explained in *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935):

> The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to "affect the substantial rights" of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense.

*Id.* (citations omitted), *quoted in United States v. Jordan,* 200 U.S.App.D.C. 64, 626 F.2d 928, 931 (1980) (per curiam); *United States v. Gianaris,* 454 F.Supp. 505, 508 (D.D.C.1977), *aff'd,* 191 D.C.App. 213, 589 F.2d 1116 (1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1235, 59 L.Ed.2d 467 (1979).

The difference between the dollar amount listed for the Alaskan Credit Union loan and the amount proved could not have prejudiced appellant by either misleading him as to the charges against him or impeding preparation of his defense. The indictment informed him that the government

planned to prove that he had not reported a debt to the Alaskan Credit Union on his loan applications. Appellant could fairly be expected to ascertain how many debts he owed to the Alaskan Credit Union. In addition, the government provided his counsel with copies of documents related to both loans. Tr. at 268. Appellant also had the benefit of a discovery proceeding that his counsel described prior to trial as "very commodious." 2–26–81 Tr. at 8.

Since appellant's trial counsel knew that appellant had reported the signature loan, *see* Tr. at 196–97, 202–03, it would have been logical for him to conclude that the government would offer evidence on the other unreported truck loan, albeit for a lesser amount than listed in the indictment. Indeed, appellant's trial counsel was obviously ready with a defense on why appellant had not intentionally failed to report the truck loan: Appellant testified that he believed the debt was satisfied by the repossession of the truck, and that his failure to remember the confession of judgment was part of his "blackout" syndrome about his life in Alaska. *See id.* at 371–74, 437–38. Since appellant did not deny the existence of the truck debt, and presented a defense as to why he failed to report it, it is hard to see what prejudice he suffered from the government's variance in proof from the amount specified in the indictment.[7]

In sum, the indictment specified a debt owed to the Alaskan Credit Union and the government proved that appellant failed to report a debt, albeit for an amount less than that listed in the indictment. The trial court cured any possible confusion among the jurors stemming from evidence on two debts to the Alaskan Credit Union by stating that appellant had reported the signature debt. For these reasons, we find

---

**7.** The variance also would not leave appellant unprotected against another prosecution for the same offense. "[T]he indictment provided sufficient detail [of the offense charged] so that a conviction necessarily would bar a subsequent prosecution for the same offense." *United States v. Freeman,* 514 F.2d 1184, 1189 (10th Cir.1975). And even if this indictment did not offer enough assurance, we would in any event

determine the question of double jeopardy "by consideration of the *entire record* of this case." *United States v. Gianaris,* 454 F.Supp. 505, 509 (D.D.C.1977) (emphasis in original) (citing *Ashe v. Swenson,* 397 U.S. 436, 445–46, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970)), *aff'd,* 191 U.S.App.D.C. 213, 589 F.2d 1116 (1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1235, 59 L.Ed.2d 467 (1979).

that the variance in this case was at most harmless error, and does not justify reversal.

## IV. JURY INSTRUCTIONS AND THE UNANIMOUS VERDICT

Third, appellant argues that his conviction must be reversed because the trial court's instructions did not ensure a unanimous jury verdict. Appellant complains that the jurors were not told that to find him guilty on each of the nine counts (for nine loan applications), they had to all agree on at least one specific, material false statement that they believed appellant had made. Since the government sought to prove fourteen false statements (thirteen unreported debts and his unreported bankruptcies) for each count, the jurors might have unanimously agreed that a false statement had been made without agreeing on which statement it was.

After stating and explaining the four elements of the offense, the court instructed: [8]

In each of the nine counts the indictment lists the fact of Mr. Mangieri's prior bankruptcy, as well as some thirteen specific loans or other obligations, as being material information concerning which he is alleged to have made false statements.

The Government need not prove each and every one of these items beyond a reasonable doubt in order for the first three elements of the offense to be satisfied. Each count alleges that Mr. Mangieri intentionally or knowingly lied about those items but, to meet the first three elements of the offense, you need not find that he lied about each item or that the exact dates or amounts are those stated in the indictment.

For example, if you find beyond a reasonable doubt that he knowingly lied about his prior bankruptcy and that such false statement related to a material fact, then the first three elements of the crime are met even though you may not be persuaded as to some or all of the amounts and dates of the debts listed.

Similarly, if you find beyond a reasonable doubt that Mr. Mangieri knowingly lied about any or all of the debts listed, and that such false statements related to material facts, then the first three elements of the offense charged are met as to any count which alleges false statements about those debts, even if the exact dates or amounts of the debts are not those listed in the indictment.

Tr. at 613–14. The trial court also gave a standard instruction on unanimity:

Your verdict must be the considered judgment of each juror. To return a verdict it is necessary that each juror agrees thereto and your verdict as to each count must be unanimous.

*Id.* at 618.[9]

Both parties had given the judge proposed instructions, which the court in large part granted. *See* R. at 15:1; 15a:1, 4–5. Appellant's five proposed instructions did not mention the need for unanimity on a particular false statement. *See* R. at 15a. Prior to giving his jury instructions, the trial court had also conferred in chambers with counsel about their proposed instructions; at that time appellant's trial counsel agreed that both counsel and the court were essentially in agreement.[10] *See* Tr. at 597–

---

8. The four elements stated by the court were that:

(1) "the defendant made a false statement or report on a loan application"; (2) "the statement or report was false as to a material fact"; (3) "the defendant made such false statements knowing at the time that they were false"; and (4) "the defendant made the false statements with the specific intent to influence the action of the Federal credit union upon his loan application."
Tr. at 611.

9. When the jury indicated in the midst of its deliberations that it wanted further clarification of the four elements of the offense, the court essentially restated that portion of its instruction, but did not repeat its instruction on the unanimity requirement. *Id.* at 623–30.

10. Appellant's trial counsel made two other comments about the conference on the proposed instructions: (1) that he had objected ("and the prosecution agreed") to the "instruction that said [the jury did not] have to convict him on all of the debts"; and (2) that the court

98. After the court gave the instructions, appellant's trial counsel made only one slight protest: He would have preferred an alternative instruction on the role of the character witness. *Id.* at 620, 631.

Appellant's trial counsel raised the general issue of unanimity for the first time after the jury foreman gave the court a note indicating the jury had reached a verdict of guilty. At that point, counsel requested a jury poll on each of the thirteen *debts,* "to make sure [the verdict] is unanimous as to each of the thirteen." *Id.* at 632. The trial court agreed only to a poll on each of the nine *counts,* not on each of the thirteen *debts* included in each count. *Id.* at 633.

To evaluate appellant's complaint, we look first to Fed.R.Crim.P. 30, which states in part:

No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

Since appellant's trial counsel did not object to the allegedly erroneous omission in the instruction before the jury retired, we are precluded from finding error now unless we conclude that it is "plain error" under Fed. R.Crim.P. 52(b). *See United States v. Wiggins,* 174 U.S.App.D.C. 166, 530 F.2d 1018, 1020 (1976). We have been especially reluctant to reverse for plain error when it is "invited." *See id.* (defense counsel asked for "the alibi instruction," and said he was "satisfied" after the judge read the standard alibi instruction); *United States v. Thurman,* 135 U.S.App.D.C. 184, 417 F.2d 752, 753 (1969) (per curiam) (defense counsel requested and urged the trial court to give the instruction later objected to), *cert. denied,* 397 U.S. 1026, 90 S.Ct. 1269, 25 L.Ed.2d 535 (1970). Although appellant's trial counsel did not offer the instruction he now attacks, neither was his role in developing the court's instruction merely passive: He submitted five instructions, discussed the proposed charge with the government and the judge in chambers, registered his

general agreement, and noted his remaining specific reservations.

Over the years, we have evolved certain propositions to assist in evaluating alleged errors in jury instructions. "Paramount among them is the principle that jury instructions are to be considered as a whole, rather than as isolated passages." *United States v. Martin,* 154 U.S.App.D.C. 359, 475 F.2d 943, 947 (1973) (footnote omitted). Indeed, the Supreme Court has stated that the court's task is "to view the charge itself as part of the whole trial." *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975).

Viewing the instruction in the context of the whole trial, appellant's argument that it was "plain error" becomes exceedingly difficult to accept. His argument is basically that when the government seeks to convict for one offense by proving two or more acts, proof of either one being sufficient, the court must, even in the absence of a request, instruct jurors that they must be unanimous in their finding that the government has proven the same one (or more) act(s). Other federal courts, however, have concluded "that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict." *United States v. Natelli,* 527 F.2d 311, 325 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *accord United States v. Pavloski,* 574 F.2d 933, 936 (7th Cir.1978); *United States v. Edwards,* 443 F.2d 1286, 1291–92 (8th Cir.1971), *cert. denied,* 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 259 (1971); *Vitello v. United States,* 425 F.2d 416, 422–23 (9th Cir.), *cert. denied,* 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 50 (1970).

This case is also readily distinguishable from the occasional federal case where the court has found that the general instruction on unanimity was insufficient. In *Natelli,* the court found the general instruction on unanimity inadequate when, as a matter of

denied his motion to strike the Alaskan Credit Union and other debts. *Id.* at 598.

law, there was insufficient evidence on one of the acts or specifications: "[T]he jury could have rejected the specification which the appellate court holds sufficiently proved, and have convicted only on the specification held to be insufficiently proved." 527 F.2d at 325. In this case, the only claim of insufficient evidence appellant raises relates to the mixup in the listing of his Alaskan Credit Union debts on the indictment. As discussed above, we have concluded that the trial judge's statement to the jury cured that problem. Therefore, this case does not fit the *Natelli* mold. *Cf. United States v. Dota*, 482 F.2d 1005 (10th Cir.) (evidence on each of five allegedly false representations on a loan application found sufficient to submit to the jury), *cert. denied*, 414 U.S. 1071, 94 S.Ct. 583, 38 L.Ed.2d 477 (1973).[11]

We are aware that the District of Columbia Court of Appeals has announced a rule requiring an instruction on the need for unanimity on the particular acts on which a guilty verdict is based. In *Hack v. United States*, 445 A.2d 634, 641 (D.C.1982), the court held that "[b]ecause of the possibility of a nonunanimous verdict, when one charge encompasses two separate incidents, the judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which indictment or incidents they find the defendant guilty." *Accord Davis v. United States*, 448 A.2d 242 (D.C.1982) (per curiam); *Hawkins v. United States*, 434 A.2d 446 (D.C.1981). Indeed, we believe the District of Columbia rule is sensible and appropriate—and we urge trial courts to employ the instruction without request in cases like this one. *Cf. United States v. O'Neill*, 463 F.Supp. 1200, 1204–05 (E.D.Pa.1979) (to ensure unanimity in a

prosecution under 18 U.S.C. § 1014, the court charged the jury that to convict on any count charging two or more misrepresentations, "the jury must be unanimous as to at least one of the alleged misrepresentations").

We cannot conclude, however, that it was plain error not to give the more particularized instruction in this case. This circuit, along with others, has not heretofore adopted a rule requiring the particularized instruction. Appellant's trial counsel not only failed to object to the instruction; he even stated his general agreement with the district court's proposed charge. In the context of that entire charge and the whole trial, we must conclude that a conscientious juror would have understood that he must agree with the other jurors on which false statement as to material facts was knowingly made.

■ Finally, we turn briefly to two related arguments made by appellant. The first is that each of the nine counts was duplicitous for alleging more than one false statement. " 'Duplicity' is the joining in a single count of two or more distinct and separate offenses." 1 C. Wright, *Federal Practice and Procedure: Criminal* § 142 (2d ed. 1982) (footnote omitted); *see* Fed.R. Crim.P. 8(a). We agree with other federal courts that "the making of a number of false statements to a lending institution in a single document constitutes only one criminal violation under 18 U.S.C. § 1014." *United States v. Sue*, 586 F.2d 70, 71 (8th Cir.1978) (per curiam); *United States v. Sahley*, 526 F.2d 913, 918 (5th Cir.1976); *see O'Neill*, 463 F.Supp. at 1202–05. The *O'Neill* court emphasized the key factor in a

---

11. This case is also a far cry from *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977), a case on which appellant relies. In *Gipson*, one count of the indictment charged a violation of a statute that listed six acts. ("Whoever receives, conceals, stores, barters, sells or disposes of any motor vehicle . . . shall be fined . . . or imprisoned . . . .") In response to a jury inquiry, the trial judge explained that unanimous agreement as to the performance of one act would support a conviction. The defense objected in a timely manner. Then the court of

appeals found that: the six acts formed two conceptual groups (receives, conceals, stores—and barters, sells, disposes); a verdict would not be unanimous if some jurors believed the defendant committed only an act in the first group while other jurors believed he only committed an act in the second; and the trial judge's explanation left open the possibility that the jurors had not unanimously agreed that the defendant had performed "acts falling within one of the . . . groupings."

duplicity analysis: 18 U.S.C. § 1014 is targeted at fraudulent loan *transactions,* rather than the particular falsehoods used to achieve the illegal transaction. Thus, in this case each of the nine counts could cover only one fraudulent transaction, but the government could use various misrepresentations in each fraudulent application to prove each offense without being duplicitous. Appellant's articulation of the duplicity rule would require the government to file a separate count for each misrepresentation on each application, thereby producing a danger of inappropriate multiple punishments for a single criminal episode. While we do not foreclose the possibility that under some circumstances multiple misrepresentations might justify separate offenses,[12] in this case we find the indictment not duplicitous.

■ We also reject appellant's second assertion, that the court erred by refusing to poll the jury on each of the thirteen debts. The trial court has substantial discretion to decide how the jury should be polled. *See United States v. Shepherd,* 576 F.2d 719, 722 n. 1 (7th Cir.1978), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1979). The purpose of a poll is to ensure uncoerced unanimity, *United States v. Mathis,* 175 U.S.App.D.C. 341, 535 F.2d 1303, 1307 (1976) (per curiam), an allegation that appellant has not raised here.

### V. MOTION TO SUPPRESS

Appellant's fourth contention is that the district court committed reversible error by not allowing him to file a motion to suppress evidence allegedly obtained by the government in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681b, 1681k, the Privacy Act, 5 U.S.C. § 552a(e)(4), and DOL regulations. Appellant attempted to file his motion on April 27, 1981, three months after arraignment and on the morning the trial began. The court refused to permit the filing because it was untimely. On May 15, 1981, appellant moved for a new trial, complaining in part that the district court abused its discretion when it refused to hear the suppression motion. On May 28, 1981, the district court denied, without opinion, this first motion for a new trial.

■ Motions to suppress must ordinarily be raised prior to trial. Fed.R.Crim.P. 12(b)(3), 41(f).[13] Moreover, the court, under Rule 12(c), may "set a time for the making of pretrial motions or requests." Finally, under Rule 12(f), failure to make the motion "at the time set by the court pursuant to subdivision (c), or prior to any extension ..., shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." [14]

■ The district court of course need not be unduly rigid in applying the timeliness requirement. As the Supreme Court noted, Rule 41(e) (later divided into the present subdivisions (e) and (f)) is "not a narrow, finicky procedural requirement,"

---

**12.** *See Bins v. United States,* 331 F.2d 390 (5th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964), where the court found that the submission of two false documents concerning a single Federal Housing Administration loan constituted two offenses under 18 U.S.C. § 1010.

**13.** The Advisory Committee Note to the 1975 amendment of Rule 12(b)(3) states:

Subdivision (b)(3) makes clear that objections to evidence on the ground that it was illegally obtained must be raised prior to trial. This is the current rule with regard to evidence obtained as a result of an illegal search. [Citations omitted.] It is also the practice with regard to other forms of illegality .... It seems apparent that the same principle should apply whatever the claimed

basis for the application of the exclusionary rule of evidence may be.

*Quoted in* 1 C. Wright, *Federal Practice and Procedure: Criminal* § 193, at 704 n. 37 (2d ed. 1982).

**14.** The Advisory Committee Note to the 1975 amendment of Rule 12(f) states:

[T]he old rule [was] unclear whether the waiver results only from a failure to raise the issue prior to trial or from the failure to do so at the time fixed by the judge for a hearing. The amendment makes clear that the defendant ... [has] an obligation to raise the issue at the motion date set by the judge....

*Quoted in* 1 C. Wright, *Federal Practice and Procedure: Criminal* § 193, at 697 n. 22 (2d ed. 1982).

and courts have discretion to hear motions to suppress during trial. *Jones v. United States,* 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Nevertheless, given the intricacies of trial scheduling and crowded dockets, and the desirability of deciding questions of government misconduct not relevant to the issue of guilt prior to trial, courts are understandably reluctant to grant relief except in unusually meritorious cases for untimely motions under Rule 12(f). *See generally* 1 C. Wright, *Federal Practice and Procedure: Criminal* § 193, at 698 & nn. 23–24, 703 n. 36 (2d ed. 1982) (discussing Rule 12(f) cases granting and denying relief for failing to raise timely defenses or objections, or to make requests in a timely manner, and concluding that courts rarely grant relief from such "waivers").

■ Our role, therefore, in reviewing the district court's rejection of appellant's motion to suppress is limited. As the court stated in *United States v. Wertz,* 625 F.2d 1128, 1132 (4th Cir.), *cert. denied,* 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980) (citations omitted), "[a] motion under [Fed. R.Crim.P.] 12(f) is addressed to the discretion of the district judge and is to be disturbed only for clear error." While in this case our job would be far easier if the district court had permitted appellant to file his motion to suppress, we cannot find it was clear error not to do so. We have examined appellant's motion (which was attached as an exhibit to appellant's first motion for a new trial), *see* R. at 18, and found his explanation of why the suppression motion was late to be wanting.

Appellant asserts that he first learned through an informant that the government illegally secured credit information about him on Thursday evening, April 23, 1981, less than 4 days before trial; he could not corroborate the information until the next evening, Friday, and he attempted to file the motion on the following Monday, the first morning of trial. The linchpin in appellant's argument is that he could not have discovered the government's allegedly illegal techniques for obtaining evidence on his credit and financial transactions earlier through due diligence.

We believe otherwise. Appellant had ample opportunity to discover the facts underlying his motion earlier. First, as the district court emphasized on the morning of trial, the court had been generous with extensions of time for the appellant to file pretrial motions. The government indicted appellant on January 15, 1981, and arraigned him on January 27, 1981, at which time the court gave him twenty days to file pretrial motions. 4–27–81 Tr. at 3. After the court denied appellant's motion for a preliminary ruling on selective prosecution (February 26, 1981), it gave him until March 19, 1981, to file other pretrial motions. On March 23, 1981, the court granted another extension, to April 3, 1981, to give appellant more time to prepare his selective prosecution motion. The court scheduled an evidentiary hearing on that motion for April 21, at which time appellant again moved to continue the hearing. The court deferred the selective prosecution hearing until after the trial, and set April 27 as the date of trial. In sum, appellant had over three months between indictment and trial to examine the government's investigative file and to inquire, favorably or unfavorably, into how its investigators had gathered evidence.

Second, it strains credulity to argue that appellant was ignorant of the government's basic modus operandi of gathering evidence against him in this case. The indictment specifies thirteen debts that appellant failed to list on his loan applications. Surely appellant knew from the indictment alone that the government had engaged in an investigation of his finances; furthermore, he recalled that on about four occasions he had refused to authorize the release of financial information to OPM. *See* H.Tr. at 121. Hence, OPM's and DOL's investigators had to obtain the information through other sources, and the obvious sources were the credit agencies and banks to whom appellant owed those debts. Since the gravamen of appellant's suppression motion was

that he did not receive notices required by statute when the government acquired the information, he should have questioned the lack of notice as soon as he learned the government had the evidence.

In addition, appellant, an investigator himself, worked with some of the very people who were checking his credit and financial obligations, increasing considerably the likelihood that he was aware at least in general terms about how such financial checks were conducted. The government's April 13, 1981 memorandum of points and authorities in opposition to the motion to dismiss for selective prosecution even set out the general sources for him: Between June and autumn 1980, Anderson had discovered and documented that appellant's nine loan applications to the DOLFCU were replete with false statements; he found that appellant had not noted his declarations of bankruptcy, and had failed to list over $30,000 in judgments and debts appellant knew to be outstanding at the time he filed the applications. R. at 12:4. Even if all these clues fell short of providing a detailed roadmap of Anderson's travels and sources, or the precise facts that appellant eventually relied on in his motion to suppress, they certainly should have pointed to a need to undertake some basic discovery as to whom the government was talking and how they were learning about the debts. Instead, appellant waited for a last-minute chance informant to trigger that inquiry.

Third, appellant suggests no reason to believe the government would have blocked any such inquiries or discovery. To the contrary, at a status call on February 26, 1981, the government stated that it had already turned many documents over to the appellant, and that it would let him see the investigative file. 2–26–81 Tr. at 7–8. Appellant's counsel replied, "[t]hat is the complete and total statement. I totally agree with it. We have had a very commodious discovery proceeding. There's been no problem." *Id.* at 8. There is no evidence in the record that the government suddenly switched course and obstructed appellant's investigation. Rather, it appears to us that appellant never bothered to ask basic questions about how the financial evidence was gathered, nor did he examine possible legal restrictions on its acquisition, until an informer identified the issue.

For the foregoing reasons, we conclude that there has been no showing that the district court abused its discretion when it ruled that the motion to suppress was untimely.[15] *Cf. United States v. Echols,* 577 F.2d 308 (5th Cir.1978) (trial court had discretion to hold that a motion to suppress had not been timely raised where facts upon which the motion was based were apparent on the face of a search warrant issued two years earlier), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1288, 59 L.Ed.2d 498 (1979).

## VI. MOTION FOR A NEW TRIAL ON THE GROUND OF NEWLY DISCOVERED EVIDENCE

■ Appellant's fifth argument is that the district court erred in denying his

---

**15.** Because the motion to suppress was untimely, we need not determine the merits of appellant's motion. Essentially, he claimed that DOL obtained his credit records from a consumer reporting agency without complying with the requirement of the Privacy Act that notice and information about certain agency records systems be published in the *Federal Register, see* 5 U.S.C. § 522a(e)(4), and in violation of the "permissible purposes" and notice requirements of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681b, 1681k. We note, however, that it is far from clear that even if appellant showed such statutory violations, that they would have necessitated suppression of evidence resulting from such inquiries. For example, the government argues that it acquired evidence for "employment purposes," a permissible purpose under the Fair Credit Reporting Act, 15 U.S.C. § 1681b(3)(B), and that any failure by the consumer reporting agency to give notice to appellant cannot be attributed to the government. *See id.* § 1681k. Even if the government had violated a statute, there also remains the question of whether suppression of the evidence would be the appropriate remedy. *Cf. United States v. Payner,* 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980) ("the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party"); *United States v. Caceres,* 440 U.S. 741, 757, 99 S.Ct. 1465, 1474, 59 L.Ed.2d 733 (1979) ("no reason why a court should . . . exclude evidence obtained in violation of [IRS] regulations").

second motion for a new trial. On February 19, 1982, appellant moved for a new trial on the ground that newly discovered evidence demonstrated that (1) Harold Anderson perjured himself at the hearing on selective prosecution to cover up his illegal methods of gathering evidence, and (2) most of the evidence the government used against appellant should have been suppressed because it was obtained in violation of federal statutes (or was the fruit of the violations). In support of this motion, appellant offered two affidavits. One affidavit was from appellant's former wife, who provided information about Anderson's statements and actions when Anderson interviewed her in June 1980. The other affidavit, from appellant's counsel, related her phone conversation with Elizabeth Kuchinski, a vice president of the Bank of California in Sacramento. This affidavit provided information about Anderson's request for financial information about appellant. The district court denied this second motion for a new trial, without hearing or opinion, on March 8, 1982.

A motion for new trial is controlled by Fed.R.Crim.P. 33. In general, if the motion is made more than seven days after the verdict, as here, it may be based only on newly discovered evidence. *Id.* Again, our reviewing role is limited: "A motion for a new trial is committed to the sound discretion of the trial judge, and should be reversed only for abuse or misapplication of the law." *United States v. Reese,* 183 U.S. App.D.C. 1, 561 F.2d 894, 902 (1977) (citations omitted). Furthermore, "[t]he burden of proof that a new trial is justified rests with the appellant, and the burden is heavier when the motion is made beyond the first seven days." *Id.* (citations omitted).

The standards for a new trial were set forth over thirty years ago in *Thompson v. United States,* 88 U.S.App.D.C. 235, 188

F.2d 652, 653 (1951), and we have not veered significantly since. *Reese,* 561 F.2d at 902; *United States v. Lee,* 168 U.S.App. D.C. 165, 513 F.2d 423, 425 (1975) (per curiam), *cert. denied,* 423 U.S. 916, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975).

> To obtain a new trial because of newly discovered evidence (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*Thompson,* 188 F.2d at 653 (citations omitted).

We apply factors (1), (2) and (3) of this test first to what is essentially a variation of appellant's earlier motion to suppress— the assertion that Anderson violated various statutes and regulations in acquiring financial evidence against appellant, and that this material and follow-up tainted evidence must be suppressed. Appellant specifically cites violations of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401–3422, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681t, and the Privacy Act, 5 U.S.C. § 552a.

Appellant's argument for a new trial on this ground fails for the same reason that the motion to suppress was untimely: He did not show due diligence in attempting to procure the evidence of illegal tactics that basic inquiries during the three months between indictment and trial would have revealed.[16] There are even additional circumstances operating against appellant on this post-trial motion. The government gave to appellant's counsel before trial, and introduced into evidence at trial, copies of loan

---

16. As the court stated in *United States v. Robinson,* 585 F.2d 274, 278 (7th Cir.1978) (en banc), *cert. denied,* 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979), "[i]t is fundamental that a defendant seeking a new trial ... must establish that the material asserted to be newly discovered could not have been discovered with due diligence before or during trial." (Citations omitted.)

documents revealing that Kuchinski was the approving bank officer. Appellant had not authorized the release of financial information about himself, and says he did not receive the notices due him under the statutes.[17] Therefore, the loan documents and lack of notice should have prompted him to ask the bank and credit personnel who had turned over information to the government whether they had complied with the statutory requirements. Similarly, there is no evidence that the government sought to obstruct any inquiries appellant might have made at any time to his wife about her interview. Appellant's "new" post-trial evidence thus appears to be merely cumulative of the evidence about financial transactions and interviews that he failed to discover and move against by a pretrial suppression motion.

In short, we find that appellant did not meet the *Thompson* burden of proving that he exercised due diligence in acquiring the "new" evidence raised on his post-trial motion. This is enough to justify its rejection. Therefore, we do not need to discuss factors (4) and (5) in *Thompson*: whether the evidence was so material as to require a new trial because it would probably have produced an acquittal. We note, however, that these criteria would raise formidable if not insurmountable obstacles for appellant: He would have to show a *clear* violation of the statutes, the necessity of remedying any illegalities by excluding the evidence, and that, without the evidence obtained thereby, the outcome of his trial would have been different.[18]

Appellant's other ground for a new trial is that Anderson perjured himself at the selective prosecution hearing. Rather than apply the *Thompson* standards to this "new" evidence, appellant urges us to use the more "relaxed" test of *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928). We noted in *United States v. Mackin,* 183 U.S. App.D.C. 65, 561 F.2d 958, 961 (1977), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977), that although the *Larrison* test has been adopted in several circuits, "[t]he Supreme Court has not found it necessary to decide whether the *Thompson* or the *Larrison* test is to be applied when perjury has occurred." *Id.* (citation omitted). Like the court in *Mackin,* we need not decide which standard will control, for we conclude that appellant's motion for a new trial was not arbitrarily denied under either test.

■ A new trial will not be granted under the more relaxed *Larrison* standard unless:

(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

24 F.2d at 87–88 (emphasis in original).

Appellant falls short of this standard on a number of counts. First, Anderson was a witness only at the hearing on the selective

---

17. The Fair Credit Reporting Act requires a consumer reporting agency that furnishes a report for employment purposes to notify the consumer at the time it provides the information, or to maintain strict procedures to insure that possible adverse information is complete and current. *See* 15 U.S.C. § 1681k. The Right to Financial Privacy Act establishes a detailed *prior* notification procedure for certain financial records sought by the government. *See* 12 U.S.C. §§ 3401–3422.

18. Note 15 *supra* discusses some of the hurdles that appellant would have to clear before

achieving suppression. His motion for a new trial also adds an allegation that the government violated the Right to Financial Privacy Act. We note that this claim would face an especially high obstacle since appellant must explain why suppression would be an appropriate remedy in the face of 12 U.S.C. § 3417(d), which states that "[t]he remedies and sanctions described [which do not include suppression] ... shall be the only authorized judicial remedies and sanctions for violations of [the Right to Financial Privacy Act]."

prosecution motion, not at the trial. Therefore, any possible perjury would relate to that issue, not to the whole trial. As discussed above, we affirm the district court's ruling on the selective prosecution motion, without regard to any decision on the credibility of Anderson's testimony. And insofar as the truth or falsity of Anderson's statements in the selective prosecution hearing would affect the legality of using certain evidence at trial, we have already decided that appellant's critical error was in not probing these matters before trial and certainly before Anderson's testimony at the post-trial hearing.

Second, appellant was surely not taken by surprise by Anderson's testimony at the suppression hearing. The IRS report and affidavits on DOL's investigation of appellant had been available since August 1981 and provided the basis for most of appellant's counsel's cross-examination during the hearing about possible inconsistencies between his testimony and the IRS report. *See* H.Tr. at 349–52, 365–71, 375–426, 435–36. The district court listened to his extensive efforts to undermine Anderson's testimony and either rejected them or, as we do, believed other evidence was sufficient to show there was no selective prosecution. Appellant cannot now refight the battle by asserting that he became aware of the evidence only after comparing the August 1981 IRS report with Anderson's testimony in November 1981, and after securing two affidavits he could have had before trial.

Third, we are not "reasonably well satisfied" that Anderson's testimony is false. Appellant has raised some questions about possible contradictions among parties' accounts of their conversations, but our review of the record does not lead us in any straightforward manner to the conclusion that Anderson committed perjury.[19]

## VII. Compliance With *Brady v. Maryland*

Finally, appellant asserts that we should reverse the district court because the government withheld materials discoverable under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Since *Brady,* "it has been clear that the prosecutorial suppression of evidence favorable to the accused, *if material* to guilt or punishment, is violative of due process, and . . . the government is affirmatively required to disclose all exculpatory materials." *United States v. Iverson,* 205 U.S.App.D.C. 253, 637 F.2d 799, 801 (1980) (emphasis added), *modified,* 208 U.S.App.D.C. 364, 648 F.2d 737 (1981) (the right to disclosure can be waived if defense counsel has actual knowledge of the evidence and chooses not to present it). Appellant states that the government failed to provide him with the following "material" information: Anderson's referral of this case to the United States Attorney's Office and the FBI in Alaska, and their reasons for not acting on it; the subpoenas issued to various financial institutions and credit unions; Anderson's telephone records and investigatory notes; and materials relating to investigators' checks on appellant with a credit bureau service. Appellant argues that if the government had given him this information, he could have demonstrated that the government's investigation violated federal statutes. This *Brady* claim appears to be yet another attempt to make the suppression argument that appellant

---

**19.** Since appellant's motion for a new trial on the basis of Anderson's alleged perjury does not meet the *Larrison* test, it obviously fails, as well, under the stricter *Thompson* standard we set out above. Rather than repeat an analysis similar to the one we just presented, we note a few salient factors that underscore appellant's inability to meet the *Thompson* criteria. First, Anderson testified at the selective prosecution hearing, not the trial, so any false statements could only have affected the decision on that motion. Second, the IRS report and affidavits gave appellant the materials he needed, in plenty of time, to attack the veracity of Anderson's testimony through cross-examination. Clearly the allegation of perjury was based on materials available before or during the selective prosecution hearing, not evidence discovered since. Third, even if the evidence about illegal evidence-gathering was actually discovered by appellant after the trial, it could have been acquired before the trial through the exercise of due diligence.

failed to make at the proper time before trial.

The issue of what evidence is material under *Brady* was addressed at length by the Supreme Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs,* the Court distinguished situations where the defense has made a pretrial request for specific information from those where it has made merely a general request. Where the defense has made a request for specific evidence, *"Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." 427 U.S. at 104, 96 S.Ct. at 2397, *quoted in United States v. Valenzuela-Bernal,* 458 U.S. ——, ——, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982) (deportation of witnesses before defendant could interview them does not produce "absence of fairness" unless the defendant explains how their testimony would have been favorable and material). A general request for anything exculpatory triggers a far more demanding standard:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112–13, 96 S.Ct. at 2401–02 (footnote omitted), *quoted in Valenzuela-Bernal,* 458 U.S. at ——, 102 S.Ct. at 3447.

 In this case, appellant made, at best, a general request of the government for *Brady*-type material. The only request we find in the record comes from the transcript of the status call of February 26, 1981, where the prosecutor stated, "[w]e have an understanding, of course, that in the event that any other documents turn up ... I will turn them over ...." 2–26–81 Tr. at 7. Appellant's briefs do not point to any more specific request.

Applying then the *Agurs* standard for general requests, we conclude that the information appellant states he was not given does not rise to the level of constitutional error. It would create no doubt about appellant's guilt. The evidence at best might have helped appellant pursue his charge that the government violated certain statutes when it gathered evidence, but, as we have reiterated, appellant did not act in a timely fashion on information he already had on that issue; this evidence appears likely to be cumulative of that he already had or could have had. Moreover, the government offered to let appellant see the investigative file. *Id.* at 8; *cf. United States v. Imbruglia,* 617 F.2d 1 (1st Cir. 1980) (newly discovered FBI agent's report did not warrant a new trial where defendant made no request, the report was insufficient to raise an entrapment issue, and its possible use to impeach credibility did not raise a reasonable doubt about the verdict); *United States v. Robinson,* 585 F.2d 274, 281 (7th Cir.1978) (en banc) (failure to produce a report of an FBI interview did not require a new trial because the use of the report would have been only cumulative), *cert. denied,* 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979).

## VIII. CONCLUSION

None of appellant's contentions rise to the level of reversible error. Yet we take the liberty of commenting that the case has many disturbing aspects that compelled close scrutiny. We believe, for instance, that the administration of justice might be improved if our district courts employed the District of Columbia courts' particularized instruction on unanimity when a single count contains several distinct acts, any one of which will support a guilty verdict. We also believe that district courts should ordinarily permit defense counsel to file mo-

tions to suppress evidence, even if they have reason to deny them for untimeliness. Finally, although we continue to wonder at the extensive agency resources devoted to the investigation of one controversial employee's background, we find reassuring the independent stance of the U.S. Attorney's Office in reviewing a client agency's referral of a troublesome employee for prosecution. Its awareness of the potential dangers in such a case, and its indisputable vigilance made both the district court's and our task easier as we sorted out the tangle of allegations underlying the selective prosecution claim.

The judgment of the district court is

*Affirmed.*