Veronica **FEDEROV**, Appellant,

v.

**UNITED STATES**, Appellee.

Stephanie G. **DONNE**, Appellant,

v.

**UNITED STATES**, Appellee.

Dana **MELLECKER**, Appellant,

v.

**UNITED STATES**, Appellee.

Nos. 88–240, 88–242 and 88–531.

District of Columbia Court of Appeals.

Argued Nov. 2, 1989.
Decided Sept. 6, 1990.

---

Grace M. Lopes, Washington, D.C., appointed by this court, for appellants.

R. Craig Lawrence, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, were on the brief, for appellee.

David M. Becker, with whom Andrew D. Roth, Arthur B. Spitzer, and Elizabeth Symonds, Washington, D.C., were on the brief, for amicus curiae, the American Civil Liberties Union Fund of the Nat. Capital Area.

Before ROGERS, Chief Judge, and FERREN and SCHWELB, Associate Judges.

PER CURIAM:

This case presents the question whether appellants, who demonstrated in support of more humane treatment of homeless persons by unlawfully refusing to leave a Metro station when ordered to do so, have proffered sufficient evidence to entitle them to discovery and to an evidentiary hearing on their claim of unconstitutional selective prosecution. They claimed they were deemed ineligible for diversion from prosecution as first offenders solely because they exercised their rights protected by the First Amendment. We agree that appellants have proffered sufficient evidence to support their allegation. We therefore reverse and remand for further proceedings.

## I.

### A. *Procedural History*

These consolidated appeals arise out of a series of demonstrations at the Farragut West Metro station in November and December of 1987. The demonstrations were held to protest the installation by the Washington Metropolitan Area Transit Authority (Metro or WMATA) of a locked gate designed to bar homeless persons from taking shelter in the station after closing time. The demonstrators positioned themselves in an area near the gate in order to prevent the gate from being closed at closing time. The three appellants, each of whom was a student at George Washington University at the time, participated in one of these demonstrations. Shortly after closing time, the demonstrators were warned that they would be arrested if they remained in the area near the gate. Each appellant refused to leave when so directed, and each was arrested and charged with unlawful entry, in violation of D.C.Code § 22–3102 (1989).

All of the appellants requested admission to the United States Attorney's pretrial diversion program, which provides an alternative to prosecution for first offenders charged with certain misdemeanors. When an eligible offender is so "diverted," the United States Attorney dismisses the charges, usually in exchange for the successful completion by the offender of a specified number of hours of community service. The offender must also refrain from the commission of an offense during the diversion period. If the offender successfully completes the diversion program, the stigma of a criminal conviction is avoided.

All of the appellants were eligible for the diversion program. Each was a first offender, and it is undisputed that unlawful entry is a divertable misdemeanor offense.

Nevertheless, all three were denied admission into the program. Reserving their appellate rights with respect to the denial of diversion, appellants entered pleas of guilty, and each received a suspended sentence and a term of probation. These appeals followed.

### B. Ms. Federov and Ms. Donne

The earlier of the cases addressed in these appeals involved Veronica Federov and Stephanie Donne. In proceedings before Judge Salzman, these appellants filed a motion to dismiss the charges against them or, in the alternative, to order the government to admit them to the pretrial diversion program. They argued, among other things, that the prosecutor's decision not to divert them constituted selective prosecution, denying them liberty without due process of law, in violation of the Fifth Amendment, and punishing them for the exercise of their right to free speech, in violation of the First Amendment. Ms. Federov and Ms. Donne asserted that the United States Attorney had a policy of denying diversion to otherwise eligible persons charged with unlawful entry whose conduct occurred in the context of a political demonstration. They claimed that similarly situated individuals, charged with unlawful entry, whose activities did not arise in the context of the exercise of First Amendment rights had been admitted to the diversion program. In support of their motion, appellants recited the following specific facts: (1) At a pretrial diversion conference, Ms. Deborah Jones of the United States Attorney's office informed Ms. Donne and her student counsel that diversion had been denied. Ms. Jones provided no explanation but stated that the decision had been made by her supervisor, Ms. Katherine Winfree, Chief of the Misdemeanor Trial Section of the United States Attorney's office. (2) Ms. Katherine Ellis of the United States Attorney's office subsequently informed Ms. Donne's student counsel that a decision had been made not to grant diversion to anyone who had participated in the Farragut West demonstrations. (3) Ms. Jones told the same student counsel that it would be futile to bring Ms.

Federov in for a diversion conference because diversion would be denied. (4) Finally, Ms. Winfree informed student counsel for Gregory Kandt, a Farragut West demonstrator who had been charged in a related case which is not before us on this appeal, that her client had been denied diversion because he had engaged in a political demonstration.

Ms. Federov and Ms. Donne also made an extensive discovery request. When the government declined to provide the material sought, their counsel filed a motion to compel discovery. In support of that motion, these appellants alleged that the United States Attorney had singled them out for prosecution because their conduct was related to expressive activity protected by the First Amendment. They based this contention in part on the preliminary results of an investigation, by D.C. Law Students in Court, into the United States Attorney's disposition of all unlawful entry cases in the District of Columbia in 1985, 1986, and 1987. Counsel represented that the investigation had identified eight persons charged with unlawful entry who had been diverted. None of these eight had been arrested in the context of a political demonstration.

At a hearing on January 28, 1988, Judge Salzman announced in open court that he would deny appellants' motions to dismiss and to compel discovery, finding them to be "utterly without legal merit." Counsel for Ms. Federov and Ms. Donne requested permission to make an offer of proof, but Judge Salzman denied their request. On February 4, 1988, Judge Salzman followed up his oral decision with a written opinion in which he formally denied appellants' motions. He held that, in order to make out a claim of selective prosecution, appellants were required to demonstrate (1) that others "similarly situated" were not prosecuted and (2) that appellants were singled out for prosecution as a result of some improper motivation on the part of the United States Attorney. *See (Elizabeth) Smith v. United States*, 460 A.2d 576, 578 (D.C.1983) (*per curiam*). He concluded

that they had failed to meet their burden in relation to both of these issues.

With respect to the first prong, Judge Salzman construed appellants' motion as suggesting that they should be considered similarly situated to "all other persons charged with the offense of unlawful entry."[1] He found that this proposed class of similarly situated persons was "painted with too broad a brush." In Judge Salzman's view, the appropriate class of persons with whom appellants should have been compared for selective prosecution purposes consisted of "all demonstrators on the homeless' behalf at the Farragut Metrorail station." He reasoned that an individual prosecuted for failing to leave a department store after previously being barred, in lieu of prosecution for shoplifting, was not 'similarly situated' with these defendants, even though that individual, too, was charged with unlawful entry. Because appellants had not alleged that they were treated differently from other Farragut West demonstrators, Judge Salzman held that their selective prosecution claims must fail.

Judge Salzman also held that appellants had failed to satisfy the second prong of the test in (Elizabeth) Smith, supra, because they had not shown that the decision to prosecute them was improperly motivated. Citing Adderley v. Florida, 385 U.S. 39, 47–48, 87 S.Ct. 242, 247–48, 17 L.Ed.2d 149 (1966), and Leiss v. United States, 364 A.2d 803, 807–09 (D.C.1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), the judge concluded that appellants had made "no colorable showing that the government violated their First Amendment rights by removing them from the closed Metro station." Acknowledging that appellants' conduct had involved expressive activity, Judge Salzman found that the government had a legitimate interest in closing the Metro at midnight "for all pur-

poses," including the conducting of a demonstration. (Emphasis in original.) He concluded that appellants had been arrested and prosecuted for their "willful and intentional refusal to vacate WMATA property" after closing hours and not for their expressive activity.[2]

Judge Salzman also stated that the United States Attorney's diversion program was reserved for persons who genuinely regretted their illegal conduct and who were willing to comply with an educational program intended to instill respect for the law. He found that appellants were accused of "knowingly violating the law," that they had intended to be arrested in order to draw attention to their views on the needs of the homeless, and that they had given no indication that they would refrain from such conduct in the future "if they believe it necessary to make another such 'statement.'" He held that "in light of [appellants'] deliberate conduct and their apparent unwillingness to agree not to trespass similarly on Metro property in the future," it could not be said that the prosecutor's refusal to admit them to the diversion program was arbitrary or malicious.

Finally, Judge Salzman denied appellants' motion to compel discovery. He found that they were not entitled to any discovery because they had failed to make out a colorable claim of selective prosecution.

## C. Mr. Mellecker

The case of the other demonstrator whose appeal is before us, Dana Mellecker, was assigned to Judge Burnett. Like Ms. Donne and Ms. Federov, Mr. Mellecker alleged that the decision to prosecute him was made pursuant to a policy of denying diversion to all persons charged with unlawful entry whose conduct occurred in the context of the exercise of First Amendment rights. Like his co-appellants, he asked the

---

1. In fact, appellants had argued that they should be regarded as similarly situated with other persons who were charged with unlawful entry and who were first offenders and hence eligible for diversion.

2. Judge Salzman held that appellants' failure to show a violation of their First Amendment rights was fatal to the second prong of their selective prosecution claims. He apparently, and reasonably, viewed their First and Fifth Amendment claims as coextensive in this respect.

trial judge to dismiss the charges against him or, in the alternative, to order the government to admit him to the diversion program. Judge Burnett held a hearing on the motion on March 29, 1988, approximately two months after the decision by Judge Salzman.[3]

At the hearing on the motion, counsel for Mr. Mellecker proffered the testimony of two witnesses whom he proposed to present in support of his allegation that the United States Attorney had a policy of not considering for diversion otherwise eligible first offenders who were charged with unlawful entry in the context of a political demonstration. The first witness, the student attorney for Gregory Kandt, was said to be prepared to testify that she had been told by the Chief of the Misdemeanor Trial Section that such a policy was in effect. Counsel further represented that this witness was prepared to describe an investigation by D.C. Law Students in Court into the United States Attorney's disposition of unlawful entry cases in the District of Columbia from January 1, 1985 through January 1, 1988.[4] Counsel explained that the students who conducted the investigation had examined the court jacket in "every" unlawful entry case which was not immediately "no-papered" (i.e., dismissed) by the government, in an effort to determine whether first offenders charged with unlawful entry had been treated less favorably where it appeared that their conduct was politically motivated.

The second witness proffered by Mr. Mellecker's counsel, a professor of statistics at Howard University, was said to be prepared to present the result of his analysis of the data collected by D.C. Law Students in Court. Counsel represented that over a three-year period, not a single political demonstrator charged with unlawful entry had been granted diversion. In contrast, approximately 27% of the persons charged with unlawful entry who were not

political demonstrators and who did not have prior records or other pending cases in the District of Columbia were admitted to diversion.

Counsel also represented that the diversion interviews given to her clients were "extremely perfunctory." Counsel stated, "My clients were never asked a single question. We were told absolutely not. When I asked what is the reason, I was advised to speak with Ms. Winfree, the head of the Misdemeanor Trial [S]ection of the United States Attorney's office...." Counsel said that she subsequently spoke to Ms. Winfree, who advised her that Mr. Mellecker would not be granted diversion because of the nature of the offense with which he was charged.

The government opposed Mr. Mellecker's request for an evidentiary hearing on his motion. In response to repeated inquiries from Judge Burnett, the prosecutor would not categorically confirm or deny that the government's policy was as represented by Mr. Mellecker, although he did claim that diversion decisions were made on an individual basis. Judge Burnett declined to hold an evidentiary hearing, but said he would assume for purposes of ruling on the motion to dismiss that the United States Attorney had a policy against diverting political demonstrators, as Mr. Mellecker alleged. The judge stated that he would consider the "pure legal issue" whether such a policy was constitutional.

On April 14, 1988, Judge Burnett issued a memorandum opinion denying the motion to dismiss. With respect to the selective prosecution claims, he essentially adopted the reasoning of Judge Salzman. He found that appellant's proposed class—those charged with unlawful entry who were otherwise eligible for pretrial diversion—was too broad. He agreed with Judge Salzman's finding that the appropriate comparison group for Mr. Mellecker's selective prosecution claim consisted of per-

---

3. Mr. Mellecker's motion was heard in conjunction with that of another Farragut West demonstrator, Lauren Fischel. Ms. Fischel has since moved to withdraw her appeal.

4. As noted earlier, the preliminary results of this investigation had been proffered by counsel for Ms. Donne and Ms. Federov in their motion to compel discovery. By the time of the hearing before Judge Burnett, the investigation had apparently been completed.

sons who, like Mr. Mellecker, had refused to leave the Farragut West Metro station as directed. Since the other members of that group did not receive more favorable treatment than Mr. Mellecker did, Judge Burnett held that the decision to deny diversion to Mr. Mellecker was not based on invidious discrimination. He agreed with Judge Salzman's analysis and concluded that Mr. Mellecker had been arrested and prosecuted for refusing to leave the Farragut West Metro station after closing time, and not because he had exercised rights protected by the Constitution.

Judge Burnett went on to reject Mr. Mellecker's separate First Amendment claims on similar grounds. He held that appellant had been prosecuted *"because of"* his failure to leave the station after closing time and not *"because of"* his protest activities. (Emphasis in original.) He also thought that Mr. Mellecker had made no showing that the United States Attorney's policy with regard to diversion "is intended to keep the defendants from protesting on behalf of the homeless or that it is in any way based on the content or nature of the message communicated in the demonstration."

## II.

Appellants frankly acknowledge that they have violated a criminal statute. They seek reversal of their convictions not on the basis of a claim of innocence but rather because, they say, other persons who have committed similar crimes have been diverted rather than prosecuted. The burden they must carry to prevail on such a claim is, and should be, a heavy one.

### A. *Prosecutorial discretion and its limits*

Although not limitless, the boundaries of prosecutorial discretion are quite wide. *See Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505–06, 7 L.Ed.2d 446 (1962). Conversely, the scope of judicial review of a decision whether to prosecute is narrow. "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful

execution of the laws; when reviewing the exercise of that power, the judicial authority is, therefore, at its most limited." *Community for Creative Non–Violence v. Pierce,* 252 U.S.App.D.C. 37, 39, 786 F.2d 1199, 1201 (1986). As the Supreme Court explained in *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985):

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motive and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

Because the discretion conferred upon the prosecutor is broad, a defendant who alleges discriminatory enforcement of a valid statute "carries a heavy burden of proof." *(Elizabeth) Smith, supra,* 460 A.2d at 578. The defendant is obliged to make an initial showing that he or she has been singled out for prosecution among others similarly situated, and that his or her prosecution was improperly motivated, *i.e.,* that it was based upon an impermissible consideration, such as race, religion, or the exercise of constitutional rights. *Id.; Davis v. United States,* 390 A.2d 976, 980 (D.C.1978); *see also United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974). To support a defense of selective prosecution, both of these propositions must be clearly and separately established. *Attorney General of the United States v. The Irish People, Inc.,* 221 U.S.App.D.C. 406, 410, 684 F.2d 928, 932 (1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). This test is a "rigorous" one, *Unit-*

ed States v. Mangieri, 224 U.S.App.D.C. 295, 298, 694 F.2d 1270, 1273 (1982), for "[t]he presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in a nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." United States v. Falk, 479 F.2d 616, 620 (7th Cir.1973) (en banc).

■■■ The United States Attorney's broad discretion as to who should be prosecuted and who should not applies with full force to management of the pretrial diversion program. See Chavez v. United States, 499 A.2d 813, 814 (D.C.1985); Baxter v. United States, 483 A.2d 1170, 1172 (D.C.1984). Nevertheless, there are limits to prosecutorial discretion. As the Supreme Court aptly put it many years ago, the law may not be enforced "with an evil eye and an unequal hand." Yick Wo v. Hopkins, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886). The prosecutor's decision whether to grant diversion is subject to judicial review for conformity with equal protection principles, and a denial of diversion may not be upheld if it "has been based upon some form of invidious or otherwise impermissible form of discrimination, or is arbitrary and capricious." Irby v. United States, 464 A.2d 136, 141 (D.C.1983) (citing United States v. (James) Smith, 354 A.2d 510, 512–13 (D.C.1976)); see also Chavez, supra; Baxter, supra.

We think it is indisputable that it would not be a proper exercise of discretion for the United States Attorney to prosecute all black participants in a demonstration while admitting their white counterparts to diversion; nor could the United States Attorney lawfully draw such a distinction between men and women. Similarly, although the point is perhaps less obvious, the government may not draw invidious distinctions between those who exercise rights protected by the First Amendment and those who do not; specifically, it may not treat the former more harshly than the latter. See Falk, supra, 479 F.2d at 619–20. This court has held that " '[a] policy which results in the closing of the Rotunda when people exercise rights protected by the First Amendment, but [which results] in the Rotunda remaining open when such rights are not being exercised, penalizes and chills constitutionally protected activity . . . .' " Wheelock v. United States, 552 A.2d 503, 509–10 (D.C.1988) (quoting United States v. Murphy, 114 Daily Wash.L. Rptr. 2149, 2158 (October 20, 1986)); accord United States v. Nicholson, 97 Daily Wash.L.Rptr. 1213 (July 17, 1969), aff'd, 263 A.2d 56 (D.C.1970).[5] This reasoning applies in equal measure to a policy under which those charged with unlawful entry who are seeking to exercise the right to free speech are prosecuted while those who are not seeking to exercise that right, receive pretrial diversion.

### B. The threshold necessary for entitlement to discovery and to an evidentiary hearing

■■■ The test for evaluating selective prosecution claims is well-established. A defendant claiming selective prosecution must show that other persons similarly situated were not prosecuted and that the decision to single out the defendant for prosecution was improperly motivated. (Elizabeth) Smith, supra, 460 A.2d at 578; see also Wayte, supra, 470 U.S. at 608, 105 S.Ct. at 1531 (to sustain a claim of selective prosecution, defendant must show that prosecutor's enforcement policies had both a discriminatory effect and a discriminatory purpose); Reiss, Prosecutorial Intent in Constitutional Criminal Procedure, 135 U.PA.L.REV. 1365, 1368–74 (1987). However, a defendant is not required to prove each element of the claim conclusively in order to obtain an evidentiary hearing or to be entitled to discovery. On the other hand, the precise showing to be made is not quite clear from the cases.[6] In Berrios,

---

**5.** Nicholson is appended to Dellums v. Powell, 184 U.S.App.D.C. 275, 566 F.2d 167 (1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).

**6.** One might reasonably conclude that the test for granting discovery on a claim of selective prosecution is somewhat less stringent—and certainly no more stringent—than the test for granting an evidentiary hearing. See, e.g., Unit-

*supra,* 501 F.2d at 1211, a case which has been "widely followed," Reiss, *supra,* 135 U.Pa.L.Rev. at 1370 & n. 15 and cases there cited, the court stated that while the defendant must establish a *prima facie* showing of selective prosecution in order to prevail on that defense, only a "colorable basis" for the claim must be shown before being entitled to discovery with respect to this defense. In *(Elizabeth) Smith, supra,* 460 A.2d at 579, however, this court sustained the trial judge's refusal to grant discovery (even though she had held an evidentiary hearing) on the ground that the defendants failed to establish a *prima facie* case of selective prosecution. This is less than a clear holding that a *prima facie* case is required, for the court relied largely on *Irish People, supra,* 221 U.S.App.D.C. at 410 & n. 8, 684 F.2d at 932 & n. 8, in which the United States Court of Appeals for the District of Columbia Circuit opined that a "colorable showing" is sufficient to obtain discovery.

Except to note that the threshold should not be set too low, we need not resolve in this case the precise contours of the showing which a defendant must make to obtain discovery or an evidentiary hearing on a claim of selective prosecution. Assuming, as the government contends, that a *prima facie* showing is required, we are satisfied that appellants have made one and that they are therefore entitled both to reasonable discovery and to an evidentiary hearing.

*C. Selecting the relevant group for comparison: Who is "similarly situated"?*

As we have noted above, appellants offered to prove by statistical evidence, by their own experiences, and by extrajudicial statements of a comparatively high-ranking official of the United States Attorney's office, that they received less favorable treatment than others similarly situated because their trespass was connected with their exercise of First Amendment rights. The trial judges refused to consider this evidence on the ground, among others, that appellants' proposed class was overbroad. They held that the appropriate class for selective prosecution purposes consisted of those persons who had participated in a demonstration at the Farragut West Metro station. We conclude, however, that this analysis begs the question. By so narrowing appellants' proposed class, the trial judges avoided consideration of the critical issue in this case.

■ As one commentator has noted, the first prong of the selective prosecution test is "reasonably straightforward." Reiss, *supra,* 135 U.Pa.L.Rev. at 1371. To satisfy this prong, a prosecuted defendant must show that others "similarly situated" were not prosecuted. Offenders who have not been prosecuted will generally be regarded as similarly situated where (1) they have engaged in "essentially" the same conduct as the defendant; (2) "as a result of which" they have been accused of violating the same statutes; and (3) the magnitude of the nonprosecuted offenders' conduct was not "materially different" from that of the defendant. *Id.* at 1371 n. 19 (citations omitted). If the first prong is satisfied, the defendant may then move on to the second prong and attempt to prove he or she was prosecuted for an impermissible reason. *Id.* at 1372.

■ Here, appellants have offered to prove that they are similarly situated to other persons charged with unlawful entry who were found to be eligible for diversion. All such persons were alleged to have trespassed on property not their own, all were consequently charged with violating the unlawful entry statute, and all were first

---

ed States v. Schmucker, 815 F.2d 413, 418–19 (6th Cir.1987) (defendant may be entitled to discovery upon introducing some evidence tending to show the existence of the essential elements of the defense, but must establish *prima facie* case to gain entitlement to evidentiary hearing); *United States v. Kerley,* 787 F.2d 1147, 1150 (7th Cir.1986) (defendant need not make

out *prima facie* case to obtain discovery but need only show a colorable basis for the claim); *but see Wayte, supra,* 470 U.S. at 621 n. 1, 105 S.Ct. at 1538 n. 1 (Marshall, J. dissenting) (discussing unresolved conflict in the federal circuits about standards governing decision whether to grant discovery); Reiss, *supra,* 135 U.Pa.L. Rev. at 1373 n. 31 (same).

offenders. Those other persons differed from appellants in at least one crucial respect: their alleged conduct was not associated with the expression of views protected by the First Amendment. However, such a distinction between persons accused of the identical statutory offense of unlawful entry cannot render such persons "dissimilarly situated" for selective prosecution purposes. To conclude otherwise is to maintain that persons whose trespass had First Amendment ramifications have, as a result of that fact alone, committed a crime of greater "magnitude" than persons whose trespass was not politically motivated, a proposition which runs afoul of *Wheelock, Murphy,* and *Nicholson, supra.* To proclaim, without analysis, that persons charged with unlawful entry whose conduct was associated with expressive activity are intrinsically more culpable than those whose conduct was unrelated to First Amendment concerns assumes the critical conclusion on which the outcome of these cases depends.

In holding that an individual prosecuted for failing to leave a department store after previously being barred, in lieu of prosecution for shoplifting, is not similarly situated to Ms. Federov and Ms. Donne, Judge Salzman apparently found it to be self-evident that the political context of the appellants' conduct rendered appellants different for purposes of selective prosecution analysis from other persons charged with unlawful entry. But department store first offenders are similarly situated to appellants in relation to the kind of wrong that they have done; they differ from appellants in that their conduct is not related to the exercise of First Amendment rights. The issue whether the United States Attorney may administer the pretrial diversion program in a manner that discriminates against persons whose conduct was so related must be confronted directly. It may not be avoided by defining those exercising First Amendment rights out of the class of first offenders who have been charged with unlawful entry and who are thus eligible for diversion.

The trial judges focused their inquiry on whether there was disparate treatment within the class of alleged individual victims of discrimination, rather than on whether those victims, taken as a class, were treated less favorably than others who were similarly situated except for the exercise of protected rights. To use an imperfect but revealing analogy, under the analysis used by the trial judges, a claim of racial disparities between a school in a predominantly white neighborhood and one in a predominantly black neighborhood would be resolved without comparing the opportunities available, respectively, to the students in each of the two schools. Rather, the court would confine itself to an inquiry as to whether there was discrimination among the students at the black school.

 At oral argument, however, counsel for the United States suggested for the first time that the exercise of First Amendment rights, as such, may not have been the only basis for distinguishing appellants from other unlawful entrants who were found eligible for the diversion program. Counsel argued, for example, that diversion may have been denied in these and other demonstration cases because such cases receive more publicity than other prosecutions for unlawful entry, and because admission of demonstrators to diversion would impede a policy of deterrence by creating a public perception that unlawful entry is not a serious offense and will be punished only by a slap on the wrist. *Cf. Wayte, supra,* 470 U.S. at 613, 105 S.Ct. at 1533–34. It may also be that demonstrations, which often involve concerted action by significant numbers of persons, require a greater police presence and are more disruptive than other varieties of unlawful entry, and that it is this aspect of such activities, rather than their expressive character, which has led the United States Attorney to treat demonstrators differently.

*Wayte* certainly suggests that such possibilities could foreclose appellants from meeting the second, "improper motivation" prong of their burden to show selective prosecution. However, in view of the importance of First Amendment rights and of appellants' proffered evidence of an extrajudicial admission by an Assistant United

States Attorney that diversion had been denied automatically because appellants were political demonstrators, we are unpersuaded that these other possible but unproved explanations first asserted on appeal can automatically defeat the required showing that appellants are "similarly situated" with other offenders who were offered diversion. Establishment of these alternative explanations for the government's administration of its diversion policy is a matter for discovery and an evidentiary hearing, not for resolution on appeal.

Our approach to this issue—defining "similarly situated" by reference to all first offenders charged with unlawful entry—follows from the Supreme Court's decision in *Wayte.* In that case, the defendant was indicted for failing to register for selective service. He moved to dismiss the indictment on the ground, among others, that he was being selectively prosecuted. He alleged that "vocal" nonregistrants had been singled out for prosecution on the basis of their exercise of First Amendment rights. *Id.* at 604, 105 S.Ct. at 1528–29. In analyzing Wayte's selective prosecution claim, the Court treated all nonregistrants as similarly situated, even though the class consisted of an estimated 674,000 individuals.[7] The Court determined that "the prosecution pool consisted of all reported nonregistrants, not just 'vocal' nonregistrants." *Id.* at 609 n. 10, 105 S.Ct. at 1531–32 n. 10. It rejected the selective prosecution claim, however, on the ground that petitioner "ha[d] not shown that the enforcement policy selected nonregistrants for prosecution on the basis of their speech." *Id.* at 609, 105 S.Ct. at 1531. Rather, reported nonregistrants had been prosecuted largely because they were the easiest violators to identify under a passive enforcement policy. *Id.* at 612–13, 105 S.Ct. at 1533–34.

If the Court in *Wayte* had accepted an analysis of the kind used by the trial judges here, it could conceivably have disposed of the selective prosecution claim by dividing the class of nonregistrants into sub-classes. Indeed, the Court's opinion reveals that the individuals who had failed to register were anything but a homogeneous group. Some of them had actively protested against the Selective Service laws. Some had submitted letters to the government declaring their refusal to register. Some had been reported by others. Some had neither reported themselves nor been reported by anyone else. Eschewing subclassifications predicated on these dissimilarities, however, the Court treated all those who refused to register as members of a single class and considered whether those selected from the class for prosecution were selected on an impermissible basis. A similar approach should have been followed here.

## D. The sufficiency of the evidence

■ In substance, appellants asserted that each of them was denied diversion with little or no inquiry into his or her personal circumstances. As to discriminatory effect, they claimed to be ready to prove that *no* political demonstrator charged with unlawful entry had received diversion during the period of the D.C. Law Students in Court study, whereas a substantial number of other alleged first offenders of the unlawful entry statute had been diverted. As to discriminatory purpose, they asserted that the Chief of the Misdemeanor Trial Branch—the official in the United States Attorney's office to whom they were referred as the supervisor in charge—had acknowledged that political demonstrators do not receive diversion, evidently without regard to their individual circumstances.

In assessing the sufficiency of the evidence, at least as to discriminatory effect upon the exercise of rights protected by the First Amendment, the modes of analysis used by courts seeking to evaluate alle-

---

7. Of 674,000 nonregistrants, only the names of those men "who [explicitly] advised [the Selective Service] that they had failed to register or who were reported by others as failing to register," *Wayte, supra,* 470 U.S. at 601, 105 S.Ct. at 1527, were subjected to enforcement procedures. The Selective Service eventually referred the names of 286 men to the Department of Justice for prosecution. *Id.* at 604 n. 3, 105 S.Ct. at 1529 n. 3. Sixteen of these 286 were indicted. *Id.*

gations of discrimination based on race are instructive. " 'In the problem of racial discrimination, statistics often tell much, and [c]ourts listen.' " *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C.1989) (quoting *Alabama v. United States,* 304 F.2d 583, 586 (5th Cir.), *aff'd,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962)). "[N]othing is as emphatic as zero." *United States v. Hinds County School Bd.,* 417 F.2d 852, 858 (5th Cir.1969), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). The zero in the present case is especially meaningful if one considers that appellants, who were young college students, were allegedly denied diversion without any appreciable inquiry into their particular circumstances. According to the D.C. Law Students in Court study, by contrast, more than a quarter of the eligible defendants in unlawful entry cases who were not engaged in expressive activity had been admitted to diversion.

■ As to discriminatory purpose, appellants have proffered an extrajudicial admission by the responsible government official which, if credited, appears to explain the zero as intentional discrimination against political demonstrators. Such admissions, for example, have been powerful evidence in cases of alleged racial discrimination. *See, e.g., United States v. Real Estate Dev. Corp.,* 347 F.Supp. 776, 783, 785 (N.D.Miss. 1972) ("statements which come close to admissions of a [racially] discriminatory policy, especially when bolstered by explicit admissions, are persuasive evidence of discrimination"). But the extrajudicial admission reflects a discriminatory purpose only if it shows that the government prosecuted appellants, rather than considered them for the diversion program, "*because* of [their] protest activities." *Wayte, supra,* 470 U.S. at 610, 105 S.Ct. at 1532 (emphasis in original). A discriminatory purpose in selective prosecution cases cannot be established merely by showing the government was aware that administration of its diversion policy would result in prosecutions, not diversions, of all political demonstrators charged for the first time with unlawful entry. *See id.*

In this case it is clear that the *Wayte* purpose test is met. Appellants have presented a *prima facie* case that, in contrast with all other unlawful entrants, the government intended to punish all demonstrators, whatever their collective message on any particular occasion. This apparently purposeful chill on First Amendment rights ostensibly violates the Constitution, *see Wheelock, supra,* and is a sufficient showing of discriminatory purpose to establish a *prima facie* case of selective prosecution under *Wayte.* It remains for the government, in response to discovery or at a hearing, to establish that any discriminatory purpose was not aimed at political discourse. Such a showing would rebut not only the claim of unlawful discriminatory purpose but also the claim that appellants are "similarly situated" with other alleged offenders deemed eligible for the diversion program. But, on this record and absent discovery, we cannot say appellants have failed to make a sufficient showing.

It bears noting, for purposes of the proceedings on remand, that the government's burden to show a nonpolitical discourse focus in the exercise of prosecutorial discretion is not necessarily heavy here. If, as the government contended for the first time at oral argument on appeal, the policy against diverting any first-time political demonstrator was motivated by a concern about public disruption or about the need to use large numbers of police—and not about the exercise of First Amendment rights—the government could respond to discovery directed at motivation and, by appropriate motion, obtain a court ruling on the true purpose underlying the government's policy. The trial court can control discovery and limit a hearing, as needed, to avoid undue intrusion into prosecutorial discretion. In sum, the problem here is that the government has presented no evidence, aside from counsel's oral argument on appeal, which would justify an inference, in rebuttal of appellants' *prima facie* case, that the motivation underlying a refusal to make diversion available for political demonstrators was not directed at First Amendment rights.

### E. Other Issues

Both trial judges apparently accepted the view that, because appellants had violated the law, the communicative nature of their conduct did not immunize them from prosecution. We have no quarrel with this proposition in the abstract, *see United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) but it does not have application here. The issue is not whether appellants violated the law and thus rendered themselves subject to arrest and prosecution. They have never contended that their participation in a political demonstration precluded application of the unlawful entry statute to their conduct. Appellants claim only that the decision to prosecute them for their acknowledged violation of the law, rather than to grant them diversion, was in reprisal for their exercise of constitutional rights. Although the trial judges correctly recognized that appellants' First Amendment activities did not immunize them from arrest and prosecution, those activities cannot legitimately serve as a basis for treating appellants more severely than those persons charged with unlawful entry whose conduct did not implicate the First Amendment.

Judge Salzman also found that the United States Attorney's diversion program is reserved for persons who genuinely regret their unlawful conduct and who are receptive to rehabilitation efforts. He held that Ms. Donne and Ms. Federov did not meet these criteria because they had knowingly violated the law and had shown no remorse for their actions. This holding was, at best, premature. The judge's assumption that the United States Attorney grants diversion only to those accused defendants who are remorseful was based on two opinions of this court which described the goals of the diversion program. *See Williams v. United States*, 427 A.2d 901, 903–04 (D.C. 1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *(James D.) Smith, supra*, 354 A.2d at 511. These opinions, however, do not purport to describe how the United States Attorney actually administers the diversion program.[8] It is the prosecutor's implementation of the program, rather than its formulation, which is at issue here. Ironically, in denying appellants' offer of proof, Judge Salzman precluded any inquiry into whether appellants' actual or supposed lack of contrition played any part in the prosecutor's decision. We do not suggest that the United States Attorney may not consider remorse or the lack thereof in determining appellants' eligibility for diversion, if this is the general practice. The record, however, is barren of any evidence that this is what occurred here.

According to defense counsel's offer of proof, there was no inquiry made by Ms. Winfree or by her subordinates as to whether any appellant was remorseful. The United States Attorney could surely make such a determination only on a case-by-case basis. Appellants offered to show, however, that there was a blanket rule denying diversion to all defendants whose arrests for unlawful entry arose in connection with activities related to the exercise of First Amendment rights. It appears that Judge Salzman simply assumed that Ms. Donne and Ms. Federov were not remorseful because they were political demonstrators. We discern no factual basis for making such an assumption with respect to them or to all political demonstrators as a group. A college student who has not previously engaged in acts of civil disobedience, for example, might well regret his or her involvement in an unlawful demonstration, while a seasoned political activist might not.

Judge Burnett predicated his decision, in part, on the ground that Mr. Mellecker had failed to show that the United States Attorney's policy with respect to diversion was based on the content of the message the demonstrators and others similarly situated were attempting to communicate. They do not claim, however, that the diversion policy as implemented gives preference to one viewpoint over another. Rather, they say

---

**8.** *Williams* simply quotes from *(James) Smith*, which is now thirteen years old. The record in the present case does not reveal whether the court's observations more than thirteen years ago correctly describe current practice.

that the United States Attorney discriminatorily denies diversion to all demonstrators who trespass in order to convey a First Amendment message, no matter what that message may be, while providing more favorable treatment to trespassers who have no message at all. This kind of discrimination is also proscribed. Just as the government may not pursue an otherwise valid regulatory interest in a manner that discriminates against a particular viewpoint or message, *see, e.g., Carey v. Brown,* 447 U.S. 455, 460–63, 470–71, 100 S.Ct. 2286, 2289–91, 2295–96, 65 L.Ed.2d 263 (1980); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215, 95 S.Ct. 2268, 2275–76, 45 L.Ed.2d 125 (1975), so it may not prosecute unlawful entry cases in a manner which discriminates between speakers and non-speakers. *See Wheelock, supra.*[9]

### F. The Dissent

Judge Schwelb argues in dissent that appellants have not made a *prima facie* showing that they are similarly situated with other unlawful entrants who have received diversion and, further, that the have not made a *prima facie* showing of discriminatory purpose. We find neither argument persuasive. Judge Schwelb agrees that "the trial judges were fatally under-inclusive when they defined the appropriate group, for purposes of comparison, as consisting solely of participants in the demonstrations at the Farragut West Metro station." *Post* at 613–14. But he is only a tad more inclusive; he perceives only political demonstrators as such—Farragut West and otherwise—as the similarly situated group. See *post* at 615–16. He does so for two reasons. First, demonstrators, in contrast with other unlawful entrants, pose a more significant law enforcement problem; they draw the media and require more police. See *post* at 616–17. Second, "unlawful entry prosecutions are a varied lot," *post* at 617, in contrast (as he sees it)

with the group of nonregistrants for the draft in *Wayte.*

As to the first, we do not understand why, after appellants have made a *prima facie* showing of non-diversion of political demonstrators, this court should decide that the reason the prosecutor refused to divert any political demonstrator was a desire to discourage crowds rather than political expression. The United States Attorney's office has never said so. Moreover, as Judge Schwelb himself notes, "appellants' conduct differed from most 'non-demonstrator' cases in that they were exercising rights protected by the First Amendment." *Post* at 616. If the prosecuting authorities had a reason for not diverting political demonstrators altogether unrelated to political expression, then the policy could have been expressed in a way that does not implicate expression, and the group automatically precluded from diversion could have been defined differently. As it is, for purposes of this appeal, the government has been willing to have the class of unlawful entrants at issue here defined as political demonstrators—a description that inherently describes persons actively conveying a message. The class is not defined differently as a crowd requiring more police resources than the usual unlawful entry case.

Nor do we find significance in Judge Schwelb's effort to distinguish unlawful entrants as a group from non-registrants for the draft on the ground that the former are "varied" while the latter are deemed monolithic. Whether one violates the unlawful entry statute or a draft registration statute, one violates a particular command of the law. Judge Schwelb himself, while arguing that "this court's decisions in unlawful entry cases reveal more variety than similarity between them," *post* at 615, also acknowledges the variety of situations in which men have refused to register for the draft; he agrees that the contexts and

---

9. Decisions such as *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983), and *Cammarano v. United States,* 358 U.S. 498, 513, 79 S.Ct. 524, 533–34, 3 L.Ed.2d 462 (1959), do not require a different result. These cases stand

for the proposition that the government is not constitutionally required to subsidize lobbying or similar activities. The present case involves allegedly harsher treatment in the criminal justice process for those who seek to exercise constitutionally protected rights.

styles for refusing to register differed from person to person. See *post* at 617 n. 6. In short, the ways in which both statutes have been violated are varied.

What we believe Judge Schwelb overlooks is appellants' *prima facie* case, shifting the burden of production to the government to show—without basing that showing on the exercise of First Amendment rights—that appellants' conduct is not essentially the same as other unlawful entrants who were eligible for diversion and that appellants' conduct was of a different magnitude.

As to discriminatory purpose, we reject once again Judge Schwelb's distinction. He agrees that appellants have presented "a *prima facie* case that demonstrators are not considered for diversion simply because they are demonstrators." *Post* at 619. And yet he finds no "basis for concluding that appellants were denied diversion *because* they had a message." *Post* at 619 (emphasis in original). That is a non sequitur *if* one accepts, as we do, that by definition a "demonstrator" in the context here—a political demonstrator—is one who seeks to convey a political message. On this premise, appellants have presented a *prima facie* case that persons arrested for unlawful entry while seeking to convey a political message are not considered for diversion because they sought to convey that message.

Accordingly, we remand the cases to the trial courts with directions to permit appellants to conduct reasonable discovery and to conduct evidentiary hearings on their claims of selective prosecution and First Amendment violation.[10]

*Reversed and Remanded.*

SCHWELB, *Associate Judge,* dissenting:

There are times when jurisprudence, like politics, makes strange bedfellows. Large-

ly for the reasons stated by my colleagues, I find myself in respectful but emphatic disagreement with the two trial judges with regard to the appropriate analysis of the principal issues in the case. I also agree with much—perhaps most—of the legal discussion in the majority opinion. Nevertheless, I am persuaded that the judgments below should be affirmed. In my opinion, appellants have not made an adequate initial showing either that they are similarly situated to those persons charged with unlawful entry who are said to have received diversion, or that the prosecutor was motivated by discriminatory animus in denying diversion to appellants. Accordingly, I respectfully dissent.

I

"SIMILARLY SITUATED"

As the majority opinion recognizes, a defendant claiming selective prosecution must show that others "similarly situated" were not prosecuted and that the decision to single out the defendant for prosecution was improperly motivated. Op. at 607. With respect to the first prong, my colleagues have adopted the definition of "similarly situated" suggested in the *amicus* brief of the American Civil Liberties Union Fund of the National Capital Area (ACLU brief):

> nonprosecuted offenders will generally be regarded as similarly situated where (1) they have engaged in essentially the same conduct [as the defendant]; (2) as a result of which they have been accused of violating the *same statutes;* and (3) the magnitude of the nonprosecuted offenders' conduct was not "materially different" from that of the defendant.

*Id.* at 608–09 (emphasis in original).[1] I have no problem with this formulation; indeed, its adoption by the ACLU surely mili-

---

**10.** Because the selective prosecution claims in these cases are based on alleged discrimination against those who assert rights secured by the First Amendment, they are closely related to appellants' other claims directly attributable to the First Amendment, and we therefore conclude that no separate discussion of the latter is required.

**1.** The quoted passage is essentially identical to a part of a footnote in Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure,* 135 U.Pa. L.Rev. 1365, 1371 n. 19 (1987), with citations from the footnote omitted.

tates against any notion that it tilts in any way in the government's favor. In my opinion, however, appellants have satisfied only the second of the three requirements enumerated in the foregoing passage.

To whom were appellants similarly situated? I agree with my colleagues that the trial judges were fatally under-inclusive when they defined the appropriate group, for purposes of comparison, as consisting solely of participants in the demonstrations at the Farragut West Metro station. To compare the experiences of those claiming selective prosecution only with those of other alleged victims of the same alleged discrimination cannot be productive. Suppose that there were simultaneous and identical rallies by pro-peace and pro-war forces and that both groups engaged in identical unlawful conduct, but that the pro-peace demonstrators were prosecuted while their pro-war counterparts were spared that humiliation and travail. It would, in my view, be incongruous, in determining whether this constituted selective prosecution, to compare what happened to the complaining pro-peace demonstrators only with the experiences of other members of their own group. That all the pro-peace demonstrators received similar treatment would not alter the decisive fact that they were treated less favorably than their pro-war counterparts.

But if the trial courts' definition of "similarly situated" was too narrow, I am afraid that my colleagues' approach to the concept is too broad. To be sure, appellants

were charged under the unlawful entry statute, as were those individuals who, according to the study by District of Columbia Law Students in Court (DCLSIC), received diversion, so that the second prong of the majority's test has to that extent been substantially satisfied.[2] A showing that the alleged violation was of the same statute, however, is obviously insufficient;[3] appellants must meet all three parts of the *Reiss*–ACLU test adopted by the majority. I do not think they have carried their burden.

Not all unlawful entrants engage in "essentially the same conduct." I note at the outset that our unlawful entry statute proscribes two discrete kinds of trespass. The first is entry without authority. The second consists of remaining on the premises without authority, or refusal to leave. *See* D.C.Code § 22–3302 (1989); Criminal Jury Instructions of the District of Columbia No. 4.44 (3d ed.1978). It is questionable whether the first category—entry without authority—is comparable at all to these appellants' conduct. Cases of both kinds, however, were apparently included in the DCLSIC study; there is certainly no indication to the contrary.

Moreover, a cursory review of this court's decisions in unlawful entry cases reveals more variety than similarity between them. *See, e.g., Hemmati v. United States,* 564 A.2d 739 (D.C.1989) (defendant refused direction to leave office of United States Senator); *Grogan v. United States,* 435 A.2d 1069 (D.C.1981) (anti-abortion pro-

---

**2.** The DCLSIC study revealed that only 26 percent of the diversion-eligible persons charged with unlawful entry who were not demonstrators received first-offender treatment; 74 percent were prosecuted, just as appellants were. This is significant because "a showing of as few as two or three other prosecutions will negate the assertion that defendant has been singled out for prosecution." *State v. Holloway,* 460 A.2d 976, 979 (Del.Super.1983). Appellants' point, however, is that they were not even considered for diversion, whereas persons not exercising rights protected by the First Amendment were given consideration for that privilege on a case-by-case basis. I agree that the denial of diversion to some, even most, of the non-demonstrators among the DCLSIC unlawful entrants

was not fatal to or dispositive of the kind of claim presented here.

**3.** Another hypothetical situation illustrates why this must be so. Although Smith, who bought a nickel bag of marijuana for his girlfriend and handed it to her, violated the same statutory proscription against distribution of a controlled substance as Jones, who sold five pounds of the stuff to a street dealer, the two have not engaged in "essentially the same conduct," and Jones' violation is "materially different" from, and far graver than, Smith's. Accordingly, Jones would have no ground for complaint if the government agreed to accept a plea of guilty from Smith to simple possession, while simultaneously insisting that Jones plead guilty to, or be found guilty of, unlawful distribution.

testers refused to leave clinic); *Jackson v. United States,* 357 A.2d 409 (D.C.1976) (spurned lover entered estranged girl-friend's apartment, broke glassware, there-after refused to leave); *Kelly v. United States,* 348 A.2d 884 (D.C.1975) (prostitute returned to hotel after having been warned not to do so); *Feldt v. Marriott Corp.,* 322 A.2d 913 (D.C.1974) (barefoot woman re-fused manager's direction to leave restau-rant); *Keith v. United States,* 232 A.2d 92 (D.C.1967) *(per curiam)* (narcotics users entered abandoned "vacant and con-demned" building); *Bowman v. United States,* 212 A.2d 610 (D.C.1965) (defendants entered area of Union Station restricted to ticket-holders proposing to board train). Obviously, the violations illustrated by these decisions are of differing character and gravity, and a reasonable prosecutor would not necessarily regard them as war-ranting identical or even similar treatment.

In the present cases, the record does not reveal the precise conduct with which those individuals in the DCLSIC study who re-ceived diversion were charged. There is no reason to believe, however, that the con-duct of many of them bore any greater similarity to that of Farragut West demon-strators than did, say, the barefoot restau-rant customer's insistence in *Feldt* on an "after the party" snack at the Junior Hot Shoppe. If variety is the spice of life, it is of the essence in compendia of unlawful entry cases.

It is true that appellants' conduct dif-fered from most "non-demonstrator" cases in that they were exercising rights protect-ed by the First Amendment, whereas the persons in the DCLSIC study who received diversion were not doing so. But contrary to appellants' contention, this was not the only difference between the two groups. Aside from the striking diversity of unlaw-ful entry cases, which makes the search for the requisite similarity elusive at best, these appellants were engaged in concerted action with many other demonstrators and were obviously attempting to publicize their defiance of the law. These features

make this case strikingly different, in ways having no connection with the exercise of First Amendment rights, from cases like those of individual defendants such as the jilted Romeo (*Jackson*), the persistent prostitute (*Kelly*), the narcotics users in the "shooting gallery" (*Keith*), or the bare-foot would-be diner (*Feldt*),[4] and no doubt at least as different from the persons who received diversion during the period stud-ied by DCLSIC.

Greater numbers of police officers are needed to control group activities, such as the demonstrations here, than to deal with individual trespassers. Law enforcement resources must therefore be diverted from other tasks. Concerted activities obviously present a far more challenging problem for law enforcement generally. Moreover, demonstrations are often designed to be covered by the media—that is how the dem-onstrators' message is communicated to the public—and the disposition of demon-strators by the criminal justice system re-ceives far more publicity than does the typical prosecution for unlawful entry. "It makes good sense to prosecute those who will receive the media's attention." *United States v. Peskin,* 527 F.2d 71, 86 (7th Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). "Publication of the proceedings may enhance the deterrent effect of the prosecution." *Id.* Newswor-thiness is not an impermissible basis for selection, *State v. Holloway,* 460 A.2d 976, 979 (Del.Super.1983) and, as the court stat-ed in *White v. Elrod,* 816 F.2d 1172, 1176 (7th Cir.), *cert. denied,* 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987),

> [t]he government is allowed to get a big-ger bang for its buck by concentrating its limited resources on those who flaunt their offenses, since proceedings against them are apt to generate more publicity and therefore communicate a more effec-tive deterrent than proceedings against the obscure and denying violator.

---

**4.** I assume for present purposes that shoeless-ness in a restaurant is not a form of "expres-sion" protected by the First Amendment. I do not think that the Founding Fathers had that type of thing in mind.

Moreover, the "bigger bang for its buck" which the government can reasonably expect to secure if it prosecutes appellants and others similarly situated rather than diverting them is but one side of the coin; although the world would not end, there might be only a whimper of deterrence, instead of a bang, if there were no prosecutions in such cases.[5] To grant diversion here would potentially convey a highly publicized message of leniency towards concerted activities which divert law enforcement officers from their conventional duties and which, to put it in the vernacular, cause a lot of ruckus. This is surely a signal which the United States Attorney may not wish to send; he may legitimately prefer to be able to focus his resources on violent crime and the narcotics activity that breeds it, and to avoid anything that would be likely to augment the number of undeterred unlawful entrants who trespass on public or private property and inconvenience the citizenry while communicating views to the public. These considerations are unrelated to the exercise of First Amendment rights, and simply do not arise in garden variety unlawful entry prosecutions in which there was no publicized concerted activity. They militate against any finding that appellants' conduct was "essentially the same as," and not "materially different in magnitude" from, the conduct of those unlawful entrants who were granted diversion.

\* \* \*

According to the majority, its approach to the definition of "similarly situated" follows from the Supreme Court's decision in *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). My colleagues say that in that case the Court treated all persons who had failed to register for selective service as similarly situated, and "eschewed sub-classification predicated on [their] dissimilarities," even though they were "anything but a homoge-

neous group." [6] At first blush, this contention appears beguilingly plausible. I do not believe, however, that it can withstand critical scrutiny.

There is no indication in *Wayte* that the question of possible sub-classification of the nonregistrants was ever raised, or that the Supreme Court decided it or gave it any consideration. My colleagues cite no language from Justice Powell's opinion for the Court that purports to address any such issue. The reason for their failure to do so is that no such language exists. As in *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925),

> [t]he most that can be said is that the point was in the [case] if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

*Accord, Thompson v. United States,* 546 A.2d 414, 423 n. 14 (D.C.1988). *Wayte* is thus no precedent for the proposition for which my colleagues seek to invoke it.

Even if the question of sub-classification had been raised and decided in *Wayte,* which it was not, the present case is readily distinguishable in a critical respect. I have previously remarked that unlawful entry prosecutions are a varied lot. People can do all sorts of different things to violate the unlawful entry statute. The conduct of a drug user in a condemned "shooting gallery" has little in common with a group demonstration at Farragut West. Those who fail to register for the draft, on the other hand, all engage in precisely the same unlawful act (or, more accurately, the same omission). There is only one way in which the statute can be violated—you do nothing when you are supposed to perform the mandatory act of registering. The individual circumstances surrounding the fail-

---

**5.** *Cf.* T.S. ELIOT, THE HOLLOW MEN (1925):
This is the way the world ends.
Not with a bang but with a whimper.

**6.** As my colleagues point out, some had actively protested the draft, others had written letters to the government declaring their refusal to register, some had been reported by others, and some had neither reported themselves nor been reported by anyone else.

ure may vary, but the offense in each case is identical.

Neither *Wayte* nor any other authority supports the proposition that the conduct of all unlawful entrants otherwise eligible for diversion is "essentially the same." Reliance on the DCLSIC study presupposes an essential identity between acts that are basically dissimilar. At least in my view, appellants therefore do not get past the first and third requirements of the majority's three-part test.

I recognize that it may be difficult or impossible for appellants to find persons "similarly situated" to themselves, as I understand that term, with whom they can properly be compared in relation to the government's refusal to grant them diversion. In most cases, unlawful entrants who act in concert with one another in a publicized manner are likely to be demonstrators too. As I have noted at page 615, *supra*, it is altogether futile, where discrimination against demonstrators *qua* demonstrators is alleged, to compare the treatment of appellants with that accorded to other demonstrators, and especially to participants in the same series of demonstrations. Under these circumstances, the reality may well be that no "similarly situated" group exists because no nondemonstrator engaged in "essentially the same conduct as appellants." If that is so, then appellants' selective prosecution claim must fail, because they will be unable to establish its basic elements.

I do not believe, however, that *appellants* have any cause for complaint on that account. They acknowledge, as they must, that they committed the crime with which they were charged. They do not deny that the punishment meted out—a short probationary term with modest amounts of community service—was authorized by law for the offense in question. Ordinarily, defendants so situated have no basis for challenging their prosecution or punishment.

When they allege selective prosecution, "the burden they must carry to prevail on such a claim is, and should be, a heavy one." Op. at 606. If the appellants cannot establish that similarly situated unlawful entrants received more lenient treatment, their claim must necessarily fail, even if the reason for their inability to prove their case is that no such similarly situated persons can be shown to exist. As this court stated in *(Elizabeth) Smith v. United States*, 460 A.2d 576, 579 (D.C.1983) (*per curiam*) (quoting, with footnotes omitted, *Attorney Gen. of the United States v. Irish People, Inc.*, 221 U.S.App.D.C. 406, 424, 684 F.2d 928, 946 (1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983)):

If, as the district court found, there was no one to whom defendant could be compared in order to resolve the question of selection, then it follows that defendant has failed to make out one of the elements of its case. Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances. Where defendant cannot show anyone in a similar situation who was not prosecuted, it has been held that he has not met even the threshold point of the *Yick Wo* [7] doctrine—"official discrimination ... between persons in similar circumstances, material to their rights...." Thus, if we accept the district court's conclusion that few are "similarly situated" with defendants—a tenuous assertion, in light of our discussion below of past registrations—we would not find for defendant.

## II

### DISCRIMINATORY PURPOSE

Appellants' claim of selective prosecution must also fail because, in my view, they have presented *no evidence tending to* show that the prosecutor was animated by a discriminatory purpose.[8]

---

7. *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–74, 30 L.Ed. 220 (1886).

8. Like my colleagues in the majority, however, I find wholly inapposite to this case the proposition accepted by both trial judges that, because

appellants violated the law, their conduct did not immunize them from prosecution. Appellants admit that they violated the law, and do not challenge the initial institution of proceedings against them. Rather, they claim that their concededly non-immunized conduct was treated

In *Wayte*, the Supreme Court held that a defendant alleging selective prosecution must show "both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose." 470 U.S. at 608, 105 S.Ct. at 1531. The Court made it clear that discriminatory purpose may not be inferred from discriminatory consequences alone:

> As we have noted, however: " 'Discriminatory purpose' ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, [442 U.S. 256], 279 [99 S.Ct. 2282, 2296, 60 L.Ed.2d 870] [ (1979) ] (footnotes and citations omitted). In the present case, petitioner has not shown that the Government prosecuted him *because* of his protest activities. Absent such a showing, his claim of selective prosecution fails.

*Id.* at 610, 105 S.Ct. at 1532 (emphasis in original).

Contrary to the government's apparent position, I am satisfied that Ms. Winfree's alleged admissions to student counsel, together with the DCLSIC statistics, make out a *prima facie* case that demonstrators are not considered for diversion simply because they are demonstrators. By contrast, a quarter of the eligible unlawful entrants who were not demonstrators received diversion. Demonstrators are, more or less by definition, persons with a message, and the communication of messages is protected by the First Amendment. What I find lacking in this record, however, is any basis for concluding that appellants were denied diversion *because* they had a message. Ms. Winfree is not alleged to

have said that this was so, and I discern nothing in appellants' statistical presentation that is relevant to the question. The only possible basis for inferring prosecutorial animus based on exercise of First Amendment rights is that the *effect* of the denial of diversion to demonstrators may be to deter the exercise of those rights, and that the prosecutors "must be held to have intended the natural result which flowed from their conduct." *Rabinowitz v. United States*, 366 F.2d 34, 56 (5th Cir.1966) (*en banc*). This, however, is the very kind of evidence of discriminatory purpose that the Supreme Court expressly held to be insufficient in *Wayte*. That the prosecutors knew or should have known that protected activity might well be chilled does not mean, under *Wayte*, that their purpose was to chill it.

It is important to note here that appellants do not contend that the denial of diversion was motivated by the content of their message, namely, advocacy of more humane treatment for the homeless. The policy which they attribute to the government is, essentially, content-neutral.[9] Appellants allege that the prosecutors were motivated by hostility to the expression by demonstrators of *any* viewpoint when they denied appellants consideration for diversion.

Not only is there no record evidence that the prosecutors were so motivated, but the notion on which the charge is based seems to me to be manifestly at odds with common sense and experience—commodities which serve us well, and which we are not required to leave behind when we don our robes. *See Barnes v. United States*, 412 U.S. 837, 845, 93 S.Ct. 2357, 2362–63, 37 L.Ed.2d 380 (1973); *Turner v. United States*, 396 U.S. 398, 417, 90 S.Ct. 642,

more severely because they exercised rights secured by the First Amendment. The correct statement that such protected activity does not immunize appellants from prosecution begs the question which they have presented.

**9.** "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech *because of disagreement with the message it conveys.*" *Ward*

*v. Rock Against Racism*, —— U.S. ——, ——, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (emphasis added). The most exacting scrutiny is required when the State "undertakes to regulate speech on the basis of its content." *Widmar v. Vincent*, 454 U.S. 263, 276, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981). No claim of content-based discrimination is made in this case.

652–53, 24 L.Ed.2d 610 (1970).[10] Why would the government want to suppress political messages—all political messages—no matter what their content may be? Even tyrannical regimes which stamp out the expression of opposing viewpoints as a matter of policy usually trot out supporters, real or coerced, to demonstrate their supposed love and admiration for the top banana. "The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in a nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice." *United States v. Falk*, 479 F.2d 616, 620 (7th Cir.1973) (*en banc*). Given that presumption—happily a reasonable one in our democracy—is it not more consistent with common sense to suppose that demonstrators are treated differently from those nondemonstrating unlawful entrants who do receive diversion because they generally act in concert and cause more problems for law enforcement authorities, and because the publicity accorded them enables the government to get a "bigger bang for its buck" if it elects to prosecute rather than to divert?

My colleagues rely on *Wheelock v. United States*, 552 A.2d 503 (D.C.1988), for the proposition that the government "may not prosecute unlawful entry cases in a manner which discriminates between speakers and nonspeakers." Op. at 613. In *Wheelock*, we held, quoting *United States v. Murphy*, 114 Daily Wash.L.Rptr. 2149, 2158 (Super. Ct.D.C.1986), that "[a] policy which results in the closing of the Rotunda when people exercise rights protected by the First Amendment, but in the Rotunda remaining open when such rights are not being exercised, penalizes and chills constitutionally protected activity." 552 A.2d at 509. But *Wheelock* concerned the propriety, in light of First Amendment concerns, of the convictions of persons who were demonstrating at the Rotunda. Selective prosecution was not alleged, nor was that issue discussed by the court. The "discriminatory

purpose" requirement of *Wayte*—namely, that demonstrators must have been prosecuted "*because* of [their] protest activities," 470 U.S. at 610, 105 S.Ct. at 1532—was therefore inapplicable. Indeed, the court's use in *Wheelock* of the words "*results in* the closing of the Rotunda" reveals that its concern was with the consequences of the government's conduct, not with its motivation.

Moreover, the basis of the decision in *Wheelock* was that the Rotunda was closed when persons exercising First Amendment rights were on the scene but not when ordinary tourists were present, and that this was true even when the former were no more numerous or disruptive than the latter. By contrast, appellants have made no showing here that they caused no more commotion or trouble than did their diverted purported counterparts.

\* \* \*

Appellants' contentions are not devoid of appeal. If the effect of the United States Attorney's policy of denying diversion to demonstrators is to chill the exercise of the right to free expression, the harm is done no matter how benign the motivation behind that policy may be. As an earlier Supreme Court observed nearly thirty years ago, "[i]t is of no consolation to an individual denied the equal protection of the laws that it was done in good faith." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). To require persons in the situation of these appellants, or persons alleging civil rights violations generally, to prove that their adversaries acted with discriminatory motives means, in effect, that they must denounce those on the other side as evildoers. At least in the racial discrimination context, I cannot think of anything that is more likely to poison the atmosphere and reduce the prospect for an amicable settlement than the introduction of the issue of bad intent. Perhaps in reduced measure, the same holds true in the

---

**10.** "'When we take our seats on the bench, we are not struck with blindness, and forbidden to know as judges what we see as men [and women].'" *Edwards v. Habib*, 130 U.S.App.D.C. 126, 140, 397 F.2d 687, 701 (1968) (quoting *Ho Ah Kow v. Nunan*, 12 Fed.Cas. 252, 255 (C.D.Cal. 1879)), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969).

kind of case we have before us. *Wayte* has, however, settled what is meant by discriminatory purpose in selective prosecution cases, and appellants have failed to make any plausible showing here of that kind of reprehensible animus against the expression of ideas.

## III

### AFFIRMANCE OR REMAND

My colleagues acknowledge, Op. at 609, that prosecutions of demonstrators may receive more publicity than those of other unlawful entrants. They likewise concede that demonstrations often involve concerted action, and may require a greater police presence, and be more disruptive, than a garden variety unlawful entry by a single individual. *Id.* Indeed, they do not exclude the possibility that it was these aspects of demonstrators' activities, rather than their expressive character, which led the United States Attorney to treat demonstrators differently and routinely deny them diversion. *Id.* According to the majority, however,

> [e]stablishment of these alternative explanations for the government's administration of its diversion policy is a matter for discovery and an evidentiary hearing, not for resolution on appeal. The mere mention of such possibilities arguably not in derogation of the First Amendment is not enough to defeat appellant's right to discovery and to a hearing.

*Id.* I am unable to agree.

As my colleagues acknowledge, *id.* at 606, judicial supervision of the government's enforcement practices is not a task which courts are competent to undertake. Such supervision entails systemic costs which are of particular concern. Moreover,

> [e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting

the prosecutor's motive and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Id.* at 606 (quoting *Wayte, supra,* 470 U.S. at 607, 105 S.Ct. at 1530).

The doctrine of separation of powers requires that the prosecutor, as an arm of the executive, be permitted to operate free from judicial fetters. *United States v. (James) Smith,* 354 A.2d 510, 513 (D.C. 1976). The selection of participants in the diversion program is confided to the discretion of the prosecutor, and no court has any jurisdiction to inquire into or review his decision, unless the objecting defendant has first made a strong initial showing of invidious discrimination. *Irby v. United States,* 464 A.2d 136, 141 (D.C.1983). "[T]he prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives in seeking an indictment [11] is to be avoided." *Falk, supra,* 479 F.2d at 620. To put it more bluntly, members of the United States Attorney's office are ordinarily supposed to spend their time prosecuting alleged offenders, rather than being required to explain to trial and appellate courts and to defense lawyers why they have undertaken the prosecutions in question. Accordingly, an appropriate affirmative showing of each element of a selective prosecution claim must be made *before* a court will order discovery or an evidentiary hearing. *See* Op. at 606 and authorities there cited. To hold otherwise would be to require prosecutors to engage routinely in litigation over whether particular defendants should have been prosecuted, instead of getting on with the job of prosecuting them so that a judge or jury can determine their innocence or guilt.[12]

The majority opinion does not specify the standard which appellants must meet in

---

11. Or, for that matter, denying diversion.

12. "[B]ecause of the intrusive nature of the discovery necessary to prove an impermissible discriminatory intent, which may require the examination of the prosecutor under oath, the discovery of internal documents concerning a

prosecution, or the disclosure of confidential law enforcement information, courts are reluctant to allow the discovery that is usually necessary to prove the prohibited intent." *Reiss, supra,* 135 U.Pa.L.Rev. at 1373 (footnotes containing citations omitted).

order to be entitled to a hearing or to discovery, except that my colleagues say that the "threshold should not be set too low." *Id.* at 608.[13] For the reasons set forth in this opinion, I think the threshold would have to be significantly lowered from prevailing standards for these appellants to be able to cross it on the record before us. I am satisfied that they have not shown the requisite similarity to the diverted individuals in the DCLSIC study or presented any plausible evidence of discriminatory purpose. Accordingly, I conclude that they cannot prevail either under a "colorable basis" test or under the more rigorous *"prima facie* case" standard.

Finally, the law will not ordinarily require the performance of a futile act. *See, e.g., Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208, 1216 (8th Cir. 1972). In my opinion, a remand here is an exercise in futility. Although I have no crystal ball, and cannot tell for certain what the testimony will show, I think the possibility that the discovery and evidentiary hearing which my colleagues have seen fit to order will result in appellants' admission to diversion hovers between very slim indeed and nil.[14] Even if my assessment of the term "similarly situated" is wrong— and I do not think it is—I see no prospect whatever for a finding by the trial courts that the United States Attorney was animated here by the kind of discriminatory purpose which is required to be shown under *Wayte.* In the meantime, however, the majority's disposition will presumably require prosecutors to be answering defen-

dants' interrogatories and explaining the reasons for what they did or did not do[15]—the very kind of eventuality which the courts seek to avoid in the absence of a strong prior showing of improper purpose. Parties and courts ought not to be required to engage in exercises which are all but certain to lead nowhere, especially when, as *Wayte* so plainly instructs us, the potential for interference with the prosecutorial function is both acute and substantial.

I respectfully dissent.

---

**13.** My colleagues are prepared to assume for purposes of this case that a *prima facie* showing is necessary. This is what we required in *(Elizabeth) Smith, supra,* 460 A.2d at 578, before discovery on the issue of selective prosecution may be ordered. In that case, there had been a prior evidentiary hearing, but the court's description of it does not indicate that there had been any interrogation of prosecutors or similar controversial activity. *Id.*

**14.** All bets would be off, of course, if the government elected to try to moot the case by granting these three demonstrators diversion.

**15.** One can readily imagine the disagreements that prosecutors and defense counsel are likely to have as to the propriety of particular dis-

covery or of questions which are likely to be asked at an evidentiary hearing. We can safely anticipate that there will be plenty of objections. Barring a settlement or other resolution not on the merits, this case is far from over, and we may very well see it again.

As it is, these very minor offenses occurred more than two and a half years ago, and appellants' probationary terms were all scheduled to expire long ago as well. Appellants have also presumably performed the community service ordered by the trial courts, and I wonder whether they will really wish to submit to diversion if they do prevail on the merits, since that would probably entail further community service. The case is not moot, for appellants' convictions of crime are at issue, but it does have its academic or abstract side.